**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF ILLINOIS, STATE OF MARYLAND, PEOPLE OF THE STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF OREGON, STATE OF VERMONT, and COMMONWEALTH OF VIRGINIA, | |
| Plaintiffs, | **COMPLAINT** |
| v. | 20-CV-3714 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW WHEELER as Administrator of the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and SUSAN PARKER BODINE as Assistant Administrator of the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
| Defendants. | |

## INTRODUCTION

1. Plaintiffs (States) bring this action against the Environmental Protection Agency (EPA), Administrator Andrew Wheeler, and Assistant Administrator Susan Parker Bodine to challenge a final agency policy under which EPA has stated it "will not" enforce a wide range of monitoring and reporting requirements under federal environmental laws. EPA justified the policy, "Temporary Policy on COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program" (nonenforcement policy), as a necessary response to the COVID-19 pandemic. However, rather than exercising enforcement discretion as authorized by law, EPA issued a broad, open-ended policy that gives regulated

parties free rein to self-determine when compliance with federal environmental laws is not practical because of COVID-19. The nonenforcement policy also makes it optional for parties to report that noncompliance to EPA, and to state and local agencies. The policy's effective waiver of these requirements, which are foundational to our federal environmental laws, exceeds EPA's authority.

2. Despite EPA's longstanding recognition that environmental monitoring and reporting requirements protect public health by informing communities of pollution hazards and deterring industry noncompliance with pollution limits, EPA failed—in the midst of a public health emergency—to consider the impacts of relaxing those obligations on public health. It was arbitrary and capricious for EPA to adopt a broad ranging policy without considering whether it will exacerbate harms to public health during the current crisis.

3. EPA has primary enforcement authority for a number of critical federal environmental laws in states as well as oversight of state enforcement of all federal environmental laws. The nonenforcement policy will result in less federal enforcement, reduced industry compliance with substantive requirements, an increased risk of chemical accidents and releases, and a decrease in publicly-available information to address pollution. These impacts will injure the States and our residents. The nonenforcement policy places the States between a rock and hard place: either incur increased burdens and attempt to fill EPA's enforcement shoes at a time when they are increasingly strapped for resources, or risk the health of our residents based on the unfounded assumption that the policy will not cause harm.

4.      The nonenforcement policy is a general statement of policy that is subject to judicial review under the Administrative Procedure Act (APA), not the type of individualized enforcement decision that may be entrusted to EPA's discretion. Because the nonenforcement policy binds EPA in future enforcement actions, creates rights, and imposes obligations on both EPA and regulated entities, the policy is a legislative rule and a final agency action that is subject to judicial review under the APA, 5 U.S.C. § 704. EPA's failure to issue the policy without complying with the APA's notice-and-comment requirements was unlawful.

5.      Because the nonenforcement policy is unlawful and harms the States and our residents, the States seek a ruling from this court vacating the policy as contrary to law.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. §§ 702 and 704.

7.      Venue is proper within this federal district, pursuant to 28 U.S.C. § 1391(e), because plaintiff State of New York resides within the district.

## THE PARTIES

8.      Plaintiff New York is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, citizens, and political subdivisions of New York.

3

9.     Plaintiff State of California is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, citizens, and political subdivisions of California.

10.     Plaintiff State of Illinois is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, citizens, and political subdivisions of Illinois.

11.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland brings this action by and through its Attorney General, Brian E. Frosh, on behalf of itself and on behalf of its citizens and residents. The Attorney General of Maryland is the State's chief legal officer with general charge, supervision, and direction of the State's legal business. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.

12.     The Michigan Attorney General is authorized by statute and under common law to initiate litigation in the public interest on behalf of the People of the State of Michigan.

13.     Plaintiff State of Minnesota is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of

itself and as trustee, guardian, and representative of all residents, citizens, and political subdivisions of Minnesota.

14.     Plaintiff State of Oregon is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, citizens, and political subdivisions of Oregon.

15.     Plaintiff State of Vermont is a sovereign state of the United States of America. It brings this action through Attorney General Thomas J. Donovan, Jr. The Attorney General is authorized to represent the State in civil suits involving the State's interests when, in his judgment, the interests of the State so require.

16.      Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, citizens, and political subdivisions of Virginia.

17.     Defendant EPA is an agency of the United States government.

18.     Defendant Andrew Wheeler is the Administrator of EPA and the highest-ranking official in the EPA. He is sued in his official capacity.

19.     Defendant Susan Parker Bodine is the Assistant Administrator of the EPA and the signatory of the Policy. She is sued in her official capacity.

## FACTUAL AND STATUTORY BACKGROUND

### COVID-19

20.　On March 11, 2020, the COVID-19 outbreak was characterized as a "pandemic" by the World Health Organization. Similarly, the Centers for Disease Control and Prevention (CDC) describes the COVID-19 outbreak as a pandemic that poses a serious public health risk. COVID-19 can cause mild to severe illness, with most severe cases typically occurring in adults 65 years and older and people of any age with serious underlying medical conditions. COVID-19 is a respiratory illness that infects the upper and lower part of the respiratory tract, causing irritation and inflammation. About 80 percent of people who contract COVID-19 experience mild to moderate symptoms, including a dry cough or a sore throat. Severe cases involve shortness of breath and pneumonia. People who are older or who have existing chronic medical conditions, such as heart disease, lung disease, diabetes, severe obesity, chronic kidney or liver disease, or who have compromised immune systems may be at higher risk of serious illness, including death.

21.　On March 13, 2020, President Trump declared the COVID-19 pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia pursuant to § 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207.

22.　As of the date of this filing, COVID-19 had reached every state in the U.S. There were over 1.3 million of known cases of COVID-19 and more than 82,000

deaths reportedly caused by COVID-19 in the U.S. alone as of May 13. As of that same date, more than 27,000 New York residents have died from the virus.

**The Nonenforcement Policy**

23.     On March 23, 2020, the American Petroleum Institute (API) wrote to EPA and requested that EPA "temporarily waiv[e] non-essential compliance obligations" under various federal environmental laws in light of the pandemic. The API, which represents more than 600 oil and gas companies across the U.S., cited "physical challenges" that would impinge compliance with "on-site testing/monitoring/reporting requirements."[1]

24.     On March 26, Assistant Administrator Bodine issued the nonenforcement policy (***Attachment A***), which applies retroactively to March 13, the date President Trump declared a national emergency. The policy states that it is "temporary," but currently has no end date.

25.     In the nonenforcement policy, EPA states it "will exercise the enforcement discretion specified [] for noncompliance covered by this temporary policy and resulting from the COVID-19 pandemic, if regulated entities take the steps applicable to their situations, as set forth in this policy." Policy at 1. The policy's application is subject to general conditions that regulated entities "should make every effort to comply with their environmental obligations" and "if compliance is not reasonably practicable," the facility owners "should" act

---

[1] Letter from Frank Macchiarola, API to Andrew Wheeler, EPA Administrator (Mar. 23, 2020) at 2 and Attachment at 2, https://www.eenews.net/assets/2020/03/24/document_gw_05.pdf.

responsibly, record certain information about the noncompliance, and return to compliance as soon as possible. *Id.* at 1-2.

26.  The nonenforcement policy sets forth several areas in which EPA will exercise enforcement discretion: compliance monitoring and reporting, consent decree obligations, facility operations, and drinking water systems.

27.  EPA stated that it intends to exercise enforcement discretion not to pursue violations of "routine compliance monitoring, integrity testing, sampling, laboratory analysis, training, reporting, and certification" (referred to in this complaint as "monitoring and reporting" requirements) because the pandemic "may" constrain the ability of companies to perform these obligations. Policy at 3. For example, the failure to conduct continuous emissions monitoring, leak detection and repair, integrity testing of storage tanks and other equipment, fence line monitoring of hazardous air pollutants, and wastewater sampling and testing will not provoke civil enforcement from EPA. *Id.* These and the numerous other monitoring and reporting obligations listed in the nonenforcement policy are used across the wide range of federal air, water, and waste laws to demonstrate industry compliance.

28.  Under the nonenforcement policy, EPA will not seek to penalize violations of monitoring and reporting requirements provided that EPA agrees that COVID-19 was the reason for noncompliance. Policy at 3. Entities are directed to use existing procedures to report noncompliance, or if reporting is not "reasonably practicable" due to COVID-19, regulated entities "should maintain this information internally and make it available to the EPA or an authorized state or tribe upon

request." *Id.* In light of the lack of a mandatory obligation to inform EPA of noncompliance related to COVID-19, the policy does not explain how EPA will become aware of violations in the first place. The nonenforcement policy also lacks any requirement that EPA will make this information about noncompliance available to states or the general public, even if companies choose to report their noncompliance to EPA.

29.     In justifying waiving enforcement for violations of monitoring and reporting requirements in advance, EPA did not cite any evidence that facilities could not continue to perform these functions. Instead, EPA stated that potential worker shortages and travel and social distancing restrictions "may" affect facility operations and the availability of workers and contractors to timely analyze samples and provide results. Policy at 2.

30.     Regarding another aspect covered by the nonenforcement policy—facility operations—EPA states its expectation that facilities will continue to comply with mandatory pollution limits, but fails to explain how EPA, states, or the general public will learn of noncompliance if facilities stop monitoring and reporting. Policy at 4-5. EPA's stated compliance expectation is further undermined by the policy's repeated use of permissive language regarding situations involving noncompliance with regulatory or permit limits. For example, the policy states that facilities that experience a "failure of air emission control or wastewater or waste treatment systems or other equipment that may result" in exceedances of emission or effluent limitations "should" inform EPA or the state agency promptly. *Id.* at 5. Even in

situations where facility operations may create an "acute risk or an imminent threat to human health or the environment," the policy merely directs owners that they "should" promptly contact the appropriate regulatory authority. *Id.* at 4.

31. The nonenforcement policy sets forth two specific areas of facility operations—interim storage of hazardous waste under the Resource Conservation and Recovery Act (RCRA) and the regulation of water pollution from livestock operations under the Clean Water Act (CWA)—in which EPA is suspending federal regulatory time limits on the on-site storage of hazardous waste and the number of livestock present at a facility if the owner determines the additional storage time is related to COVID-19. *Id.* at 4-5. By so doing, the policy eases more protective federal regulations that would otherwise apply to affected facilities. *See* 40 C.F.R. § 262.14-17 (RCRA requirements for interim storage of hazardous waste); 40 C.F.R. § 122.23 (CWA requirements for concentrated animal feedlot operations (CAFOs)).

32. With respect to drinking water systems, EPA has "heightened expectations" that operators of public water systems will continue normal operations and maintenance as well as required sampling to ensure the continued safety of drinking water supplies, but the nonenforcement policy nonetheless recognizes that operators may decide in light of COVID-19 to forego monitoring and reporting of certain contaminants. *See* Policy at 6.

33. Although protection of public health is at the core of EPA's mission, nowhere does the nonenforcement policy acknowledge or discuss the potential adverse impacts on public health that the policy will have, including impacts from

increased pollution, and a lack of information about that pollution, that may result from the policy.

34.     By providing a broad, open-ended, upfront waiver of enforcement of monitoring and reporting obligations, EPA departed from longstanding policy through multiple Presidential administrations of issuing time-limited "no action" assurances that were tailored to specific industries and circumstances.

35.     Upon EPA's issuance of the nonenforcement policy, former EPA officials and several members of Congress promptly criticized the policy for its overbreadth and lack of transparency. Although EPA issued a press release disputing that the policy would result in more pollution, the agency's statement further confirmed the binding nature of the policy on EPA as to monitoring and reporting obligations:

> The policy says that EPA *will not* seek penalties for noncompliance with routine monitoring and reporting requirements if, on a case-by-case basis, EPA agrees that such noncompliance was caused by the COVID-19 pandemic.[2]

36.     In contrast to the nonenforcement policy, state agencies have issued circumscribed policy statements that provide guidance for regulated entities during the COVID-19 pandemic without waiving requirements that protect public health. For example, Michigan's Department of Environment, Great Lakes, and Energy issued a policy stating that "[d]uring COVID-19 response, regulated entities are expected to maintain compliance with

---

[2] *See* https://www.epa.gov/newsreleases/epa-sends-letter-all-members-congress-correct-record-temporary-enforcement-policy (emphasis added).

environmental regulations and permit requirements to protect Michigan's environment and public health."[3] Michigan facilities that face "unavoidable noncompliance directly due to the COVID-19 emergency" may submit a request for regulatory flexibility by email to the Department that provides required information about the circumstances and the anticipated impacts of the noncompliance. Each request is a matter of public record, and available electronically on the agency's website. The Department will determine on a case-by-case basis whether to exercise enforcement discretion. Other state agencies have issued similar polices that set forth an expectation of compliance with all requirements but for case-by-case consideration of regulatory flexibility where compliance is not feasible. *See*, *e.g.,* California EPA Statement on Compliance with Regulatory Requirements During the COVID-19 Emergency (Apr. 15, 2020) ("Specific time-delimited remedies, such as extension of deadlines, may be warranted under clearly articulated circumstances, but regulated entities that cannot meet a specific regulatory requirement due to emergency government directives or specific hardship must contact the appropriate CalEPA board, department or office before falling out of compliance.").[4]

    37.    On April 1, 2020, in response to the nonenforcement policy, a group of non-governmental organizations filed a petition for emergency

---

[3] https://www.michigan.gov/egle/0,9429,7-135--523592--,00.html.

[4] https://calepa.ca.gov/2020/04/15/calepa-statement-on-compliance-with-regulatory-requirements-during-the-covid-19-emergency/.

rulemaking with EPA. The petition requested that EPA promulgate emergency rules obligating companies that intend to invoke COVID-19 as a defense for noncompliance to formally notify EPA and for EPA to make that information publicly available. On April 16, 2020, because EPA had not taken any action on the petition, the groups filed suit in *NRDC, et al. v. Bodine, et al.*, S.D.N.Y. Case No. 1:20-cv-3058. That case is pending with this Court.

38.     On April 9, 2020, the California Attorney General sent a letter to Assistant Administrator Bodine objecting to the nonenforcement policy and supporting the demand by NRDC and other nonprofit groups for increased transparency in implementing the nonenforcement policy. The California Attorney General urged "*at a minimum* regulated entities must report noncompliance with mandatory environmental obligations to the EPA and applicable state and regulatory authorities" and that the reports "immediately be made publicly available so that the impacted communities can take necessary steps to mitigate the potential impacts from such noncompliance."

39.     On April 15, the Attorneys General of New York, Illinois, Iowa, Maryland, Massachusetts, Michigan, Minnesota, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin sent EPA Administrator Wheeler a letter objecting to the overbroad nature of the policy and EPA's failure to consider the policy's impact on public health, especially the health of people of color and low income communities who are suffering

disproportionate mortality and other adverse outcomes from COVID-19. The Attorneys General asked that EPA rescind the Policy.

40.     EPA has not responded to either letter or taken any of the actions requested by the Attorneys General.

**Compliance Monitoring and Reporting and Enforcement Under Federal Environmental Laws**

41.     EPA is responsible for administering numerous environmental statutes, including the Clean Air Act, 42 U.S.C. § 7401, *et seq.* (CAA), Clean Water Act, 33 U.S.C. § 1251, *et seq.* (CWA), Safe Drinking Water Act, 42 U.S.C. § 1401 *et seq.*; (SDWA); Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.* (RCRA), Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601, *et seq.* (CERCLA), and the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11004, *et seq.* (EPCRA).

42.     EPA is also charged with the enforcement of federal environmental laws. *See*, *e.g.*, 42 U.S.C. § 7413 (CAA); 33 U.S.C. § 1319 (CWA); 42 U.S.C. § 6928 (RCRA). EPA may delegate certain enforcement and implementation powers to states, local governments, or tribes. Where such delegation has occurred, the state, local agency, or tribe becomes the primary implementer and enforcer of that federal program, with continued oversight from EPA. That continued oversight—including the ability of EPA to commence enforcement actions—is especially important concerning compliance with federal environmental requirements that protect states from pollution originating in upwind or upstream states.

43.     Federal environmental laws also contain citizen suit provisions, which authorize any person (including any state) to commence litigation to address violations of these statutes where EPA or a delegated state is not taking action to address noncompliance. *See*, *e.g.*, 42 U.S.C. § 7604 (CAA), 33 U.S.C. § 1365 (CWA); 42 U.S.C. § 6972 (RCRA).

44.     Fundamental to the enforcement of these laws are requirements that regulated entities demonstrate compliance through regular monitoring and reporting. Compliance monitoring and reporting take many forms and are essential for EPA, states, local governments, tribes, and citizens to enforce federal environmental laws and protect human health and the environment. These compliance monitoring and reporting requirements are not mere paperwork exercises—they are bedrock obligations that are fundamental to the successful implementation of these laws. Indeed, EPA has recognized that compliance monitoring and reporting are integral to protecting human health and the environment:

> Compliance monitoring is one of the key components EPA uses to ensure that the regulated community obeys environmental laws and regulations. It encompasses all regulatory agency activities performed to determine whether a facility (or group of facilities, such as plants related geographically, by sector, or corporate structure) is in compliance with applicable law. Compliance monitoring includes:
>
> - formulation and implementation of compliance monitoring strategies
> - on-site compliance monitoring: compliance inspections, evaluations, and investigations (including review of permits, data, and other documentation)
> - off-site compliance monitoring: data collection, review, reporting, program coordination, oversight, and support

- inspector training, credentialing and support.[5]

45.     EPA also has recognized the vital role compliance monitoring plays in meeting the goals Congress set out to accomplish in federal environmental laws:

> Compliance monitoring is a key component of any effective environmental compliance and enforcement program.  It encompasses all of the means used to make a compliance determination.  The primary goals of compliance monitoring include:
>
> - Assessing and documenting compliance with permits and regulations,
> - Supporting the enforcement process through evidence collection,
> - Monitoring compliance with enforcement orders and decrees,
> - Creating deterrence, and
> - Providing feedback on implementation challenges to permit and rule writers.[6]

Thus, as EPA has recognized, monitoring and reporting by regulated entities are foundational requirements of the functioning of our federal environmental laws.

**The Statutes Impacted by the Nonenforcement Policy**

Clean Air Act

46.     The CAA is one of the most comprehensive environmental statutes and contains a number of programs that mandate and rely on compliance monitoring and reporting by regulated entities. EPA has noted that CAA "compliance monitoring ensures that the regulated community obeys environmental

---

[5] *See* https://www.epa.gov/compliance/how-we-monitor-compliance

[6] *See* https://www.epa.gov/compliance/compliance-monitoring-programs.

laws/regulations through on-site inspections and record reviews that can lead to enforcement when necessary."[7]

47. Numerous CAA provisions, across its multiple programs, provide for mandatory monitoring and reporting. *See* 42 U.S.C. § 7410(a)(2)(B) (state implementation plans); § 7412(r)(7)(A) (chemical accident safety prevention); § 7414 (inspections and information requests); § 7475(e) (Prevention of Significant Deterioration permitting); § 7661a (Title V operating permits). Monitoring and reporting under these programs occurs at facilities, at the fence line of facilities, or in downwind areas.

48. The nonenforcement policy applies to the following federal monitoring and reporting requirements that are essential to fulfilling CAA programs aimed at protecting public health and welfare:

    a. <u>Stack Testing</u>. Compliance with pollution limits on major stationary sources imposed by the CAA's hazardous air pollutant program (section 112), 42 U.S.C. § 7412, New Source Performance Standards (section 111), *id.* § 7411, and New Source Review (sections 165 and 172), *id.* §§ 7475 and 7502, depends in part on stack testing. Stack tests measure the amount of pollutants emitted from a facility, including the removal efficiency of a pollution control device.

    b. <u>Continuous Emission Monitoring Systems</u>. "Good Neighbor" rules under section 110(a)(2)(D), 42 U.S.C.§ 7410(a)(2)(D) and Title IV's

[7] *See* https://www.epa.gov/enforcement/air-enforcement#compliance.

Acid Rain Deposition program rely on continuous emission monitoring systems (CEMS) to ensure that power plants and other major stationary sources are properly limiting their emissions of pollutants such as nitrogen oxides and sulfur dioxide that can cause respiratory illness and premature death.

c. <u>Leak Detection and Repair</u>. Leak Detection and Repair (LDAR) is regularly used at facilities that process and store petroleum and chemicals to monitor equipment—including wellheads, storage tanks, and pipelines—to determine whether volatile organic compounds (VOCs), methane, and hazardous air pollutants are leaking, alerting facility owners to repairs that need to be done to protect public health and the environment. Enforcing LDAR requirements at oil and gas facilities is particularly important when the price of oil or gas is low because facilities have less financial incentive to promptly detect and repair methane leaks (and other pollutants such as VOCs that are often released together with methane).

d. <u>Fence line monitoring</u>. Fence line monitoring provides an important function by alerting adjacent communities to elevated levels of hazardous air pollutants that occur as fugitive emissions at nearby industrial facilities, such as refineries. For example, a recent report based on fence line monitoring found emissions of benzene—a

carcinogenic pollutant—exceeded EPA action levels at ten petroleum refineries in the U.S.[8]

    e. <u>Tank testing</u>. The CAA's Risk Management Program, which implements section 112(r)(7), 42 U.S.C. § 7412(r)(7), requires facilities that handle certain quantities of listed hazardous chemicals to perform regular testing to evaluate the integrity of storage tanks. *See* 40 C.F.R. 68.73(d). This testing serves a vital function by enabling facility owners to detect tank flaws or leaks that could result in accidents and, in some instances, catastrophic explosions.

<u>Clean Water Act</u>

49.    The CWA establishes the basic structure for regulating discharges of pollutants into the water of the United States and issuing water quality standards to protect surface waters. The CWA makes it unlawful to discharge any pollutant from a point source into navigable waters without a discharge permit issued under the National Pollution Discharge Elimination System (NPDES) program. Industrial, municipal and other facilities must obtain discharge permits if their discharges go directly into surface waters.

50.    Compliance monitoring is an essential aspect of the NPDES discharge permit program, as EPA has recognized:

---

[8] Environmental Integrity Project, *Monitoring for Benzene at Refinery Fencelines* (Feb. 6, 2020), https://environmentalintegrity.org/wp-content/uploads/2020/02/Benzene-Report-2.6.20.pdf

Compliance monitoring is a cornerstone of EPA's program to protect and restore water quality. The primary goal of the combined EPA and state compliance monitoring efforts, such as on-site inspections and evaluation of self-reported Discharge Monitoring Report (DMR) data, is to ensure and document whether entities regulated under the NPDES and pretreatment programs should accurately identify and document noncompliance, support the enforcement process, monitor compliance with enforcement orders and decrees, establish presence in the regulated community, deter noncompliance, support the permitting process and further the broad watershed protection and restoration goals of the NPDES program.[9]

Safe Drinking Water Act

51.    The SDWA was passed to ensure that Americans have safe, good quality water to drink. The law and EPA's implementing regulations establish standards regulating more than 90 contaminants with an aim of ensuring a minimum quality of all public drinking water systems. Under the SDWA, EPA's regulations set maximum contaminant levels for particular contaminants or required ways to treat water to remove contaminants. *See* 42 U.S.C. § 300g-1; 40 C.F.R. § 141. The regulations also include requirements for water systems to regularly sample water and test for contaminants to make sure that standards are achieved. 40 C.F.R. § 141.74.

52.    EPA has recognized that public information about water quality is an "important component[]" of safe drinking water.[10] Operators of public drinking water systems are required to report annually to their consumers on water quality,

---

[9] *See* EPA's July 21, 2014 Memorandum: Issuance of Clean Water Act National Pollutant Discharge Elimination System Compliance Monitoring Strategy, https://www.epa.gov/sites/production/files/2013-09/documents/npdescms.pdf.

[10] EPA, *Understanding the Safe Drinking Water Act* (June 2004), at 1 https://www.epa.gov/sites/production/files/2015-04/documents/epa816f04030.pdf.

including contaminant levels. 40 C.F.R. § 141.152. The importance of public information about water quality was borne out by the lead contamination of water that caused a public health crisis in Flint, Michigan.

Resource Conservation and Recovery Act

53.     RCRA was enacted to ensure that solid waste and hazardous waste are managed in a manner that is protective of human health and the environment. RCRA includes a number of programs that regulate, among other things, hazardous waste generators; transporters; treatment, storage, and disposal facilities; and other operations such as used oil facilities, universal waste handlers, reclamation of hazardous secondary materials, and underground storage tanks.

54.     According to EPA, "[t]he RCRA compliance monitoring program is designed to attain and maintain a high level of compliance throughout the regulated community with statutory requirements, and applicable RCRA regulations, permits, orders, and settlement agreements."[11]

Comprehensive Environmental Response, Compensation, and Liability Act

55.     CERCLA requires parties to immediately notify the National Response Center ("NRC") of any release of a hazardous substance over a threshold set by the EPA—known as the "reportable quantity." *See* 42 U.S.C. § 9603. The NRC acts as the single federal point of contact for all pollution incident reporting, 40 C.F.R.

---

[11] *See* EPA's September 2015 Compliance Monitoring Strategy for the Resource Conservation and Recovery Act (RCRA) Subtitle C Program, https://www.epa.gov/sites/production/files/2013-11/documents/rcracms.pdf.

§ 300.125(a) and must convey the notification expeditiously to all appropriate Government agencies, including any affected State. 42 U.S.C. § 9603(a).

Emergency Planning and Community Right to Know Act

56.     EPCRA requires parties to notify state and local authorities whenever covered pollutants (which it refers to as "extremely hazardous substances") are released into the environment. *See* 42 U.S.C. § 11004.

57.     Although the nonenforcement policy indicates that it does not apply to reporting of "accidental releases" or CERCLA "enforcement instruments," the policy would apply to releases that would otherwise be reportable under EPCRA and CERCLA. *See* 42 U.S.C. §§ 9603 and 11004(a)(2) (requiring reporting of releases exceeding reportable quantities stemming from normal operations).

**Emergency Authority Under Federal Environmental Laws**

58.     Many federal environmental laws contain provisions that provide EPA with express authority to deal with situations in which imminent harm to public health and the environment from pollution requires the agency to take immediate action rather than following standard procedures. *See*, *e.g.*, 42 U.S.C. § 7603 (CAA provision authorizing Administrator to file suit to "immediately restrain any person" causing or contributing to such pollution or "to take such other action that may be necessary"); 33 U.S.C. § 1364(a) (substantially same language in CWA); 42 U.S.C. § 300i (SDWA provision stating that Administrator "may take such actions as he may deem necessary in order to protect the health" of those in danger).

59.     In addition, the CAA contains a provision that allows for the temporary waiver of requirements of state implementation plans where the President has declared a national or regional energy emergency. 42 U.S.C. § 7410(f). The statute gives that authority solely to the President, and expressly prohibits its delegation to EPA or any other third party. *Id.* § 7410(f)(1).

## HARM TO THE STATES

60.     As discussed below, the nonenforcement policy harms the States' proprietary, informational, and substantive interests. An order from this Court setting aside the policy would prevent regulated industries from relying on it to excuse noncompliance with federal environmental laws, thus preventing these harms to the States.

## The Nonenforcement Policy Injures the States' Proprietary Interests

61.     By announcing that EPA is significantly curtailing its enforcement of federal environmental laws, the nonenforcement policy harms the States in their proprietary capacity by forcing them to expend state resources to attempt to fill this void.

62.     For example, EPA is the primary enforcement authority of the CWA's pretreatment program for wastewater discharges in Illinois and New York. The pretreatment program, which is part of the NPDES permitting regime, requires that certain commercial and industrial facilities first treat wastewater to remove harmful pollutants before discharging effluent to wastewater treatment plants. *See* 40 C.F.R Part 403. The nonenforcement policy will likely result in reduced EPA

enforcement of requirements that industrial and commercial dischargers provide reporting on the amounts and concentrations of pollutants. *See* 40 C.F.R. § 403.12. Together with the anticipated reduction of EPA inspections and sampling at industrial and commercial dischargers, there is a substantial likelihood of increased water quality violations at and/or downstream from wastewater treatment plants.

63.     As a result of the nonenforcement policy, the New York State Department of Environmental Conservation, which implements the other aspects of NPDES permitting in New York, anticipates increasing its analysis of monitoring data regarding effluent discharge and post-processing wastewater, as well as potentially increasing its enforcement activities under federal or state law if violations are detected. Such exercises of state enforcement authority will be time-consuming, burdensome, and expensive, and are only necessary to fill the gap left by the nonenforcement policy.

64.     In addition, because EPA enforces the CAA's chemical accident safety program (42 U.S.C. § 7412(r)(7)) in many states, including in plaintiff states Illinois, Maryland, Michigan, Minnesota, New York, Oregon, Vermont, and Virginia, EPA's curtailing of federal enforcement—including ensuring that facilities are regularly conducting tank testing to detect potential releases of pollutants—means that those States will not know whether facilities are fulfilling those obligations. To attempt to fill that void, States would have to expend additional resources by investigating facility compliance under state law (if possible) and using the CAA's citizen suit provision to bring enforcement cases if violations are discovered. These added

demands on state financial resources resulting from the nonenforcement policy comes when the States are facing severe budget constraints as a result of the COVID-19 pandemic.

65. Less EPA enforcement of the CAA's chemical accident safety program is likely to result in more numerous and more serious chemical accidents, resulting in greater response costs incurred by those States. This outcome is not just limited to states in which EPA retains enforcement of the chemical accident safety program under section 112(r)(7), but to all states, given that EPA has sole authority to enforce the requirement in section 112(r)(1) that facilities handling extremely hazardous substances exercise a general duty of care in their operations.

**The Nonenforcement Policy Injures the States' Informational Interests**

66. Monitoring and reporting of discharges of pollutants into the environment is mandatory under numerous environmental statutes such as the CAA, CWA, RCRA, and the SDWA, as discussed above. States and their citizens have a statutory right to obtain compliance monitoring reports that are at the heart of the nonenforcement policy. Further, as noted above, EPA itself has recognized that compliance monitoring and reporting are essential components of environmental laws and vital tools to protect public health.

67. The nonenforcement policy's blanket, prospective waiver of compliance monitoring and reporting requirements mandated by federal environmental statutes is likely to result in less monitoring and reporting by regulated industries. This resulting decrease in monitoring and reporting will deprive the States and

their citizens of essential information relating to the pollutants released into the environment. This lack of information will stymie the ability of States and citizens to use citizen suits in federal environmental statutes or use state laws to remedy noncompliance and take other actions necessary to protect public health and the environment.

68.     In addition, EPCRA mandates that polluters report releases of hazardous chemicals to state and local emergency response agencies for use in emergency response. Because the nonenforcement policy effectively allows regulated entities to suspend compliance monitoring, the policy creates a risk that such releases will go unreported to state and local emergency response agencies. Such a situation would hinder state and local emergency responders' ability to respond effectively to releases of hazardous substances and would endanger the lives and health of emergency responders and the public at large.

**The Nonenforcement Policy Injures the States' Interests in the Health and Safety of Our States' Residents and Our Natural Resources**

69.     In addition to depriving the States of key information regarding pollution, the nonenforcement policy undermines another important function of compliance monitoring and reporting—deterring noncompliance with substantive environmental law requirements. Deterrence of illegal polluting activity is a key underlying purpose of environmental monitoring programs under federal environmental laws. EPA recognizes that compliance monitoring deters noncompliance and, thus, results in less pollution. This understanding is reiterated

by EPA in its enforcement penalty policies and has been further endorsed in penalty decisions by the EPA's Environmental Appeals Board.[12]

70.    By stating upfront EPA's decision that it will not enforce against monitoring and reporting noncompliance related to COVID-19, and by failing to require facilities to notify EPA or states of such noncompliance, the nonenforcement policy likely will reduce the deterrent effect of environmental laws and result in increased noncompliance, in turn increasing the releases of pollution that are harmful to public health and the environment.

71.    Millions of people live in areas of our States that are in non-attainment with National Ambient Air Quality Standards for fine particulate matter and/or ozone, such as those living in the Chicago, New York City, and Los Angeles metropolitan areas. As EPA has found, short-term and long-term exposure to elevated concentrations of these pollutants can cause respiratory illnesses and premature death. In addition, many people in our States live in communities that are located near sources of hazardous air pollutants, which are pollutants that are known or suspected to cause cancer or other serious health effects.[13] The risks from

---

[12] Jon D. Silberman, *Does Environmental Deterrence Work? Evidence and Experience Says Yes, But We Need to Understand How and Why*, 30 ELR 10523 (July 2000), https://elr.info/news-analysis/30/10523/does-environmental-deterrence-work-evidence-and-experience-say-yes-we-need-understand-how-and-why; *see, e.g., In the Matter of Henry Stevenson and Parkwood Land Co.,* 16 E.A.D. 151, 174-75, 2013 EPA App. LEXIS 36 (Oct. 24, 2013).

[13] *See* https://www.epa.gov/enforcement/national-compliance-initiative-creating-cleaner-air-communities-reducing-excess.

pollution released from these facilities often disproportionately impacts low-income and minority communities.

72. The nonenforcement policy likely will result in increased air and water pollution from facilities that will take advantage of EPA's nonenforcement posture. For our residents that live near or downwind or downstream of these facilities, increased fine particulate matter and ozone pollution will cause or exacerbate health harms, such as respiratory conditions like asthma in children and adults, cardiovascular disease, diabetes, and cancer, resulting in premature deaths.

73. Furthermore, according to the CDC, COVID-19 presents a significantly higher risk to people with previous medical conditions such as chronic lung disease,[14] which is significantly exacerbated by increased industrial pollution. States' hospitals that are or will become overburdened with treating COVID-19 patients can ill afford increased hospital admissions triggered by more pollution.

74. In addition, the nonenforcement policy increases the risk that the States and their residents will suffer harm from chemical facility accidents. As discussed above, EPA is the primary enforcer of the chemical accident safety program under section 112(r)(7) of the CAA in Illinois, Maryland, Michigan, Minnesota, New York, Oregon, Vermont, and Virginia, and our States rely on EPA to ensure that regulated facilities take action to prevent and detect releases of

---

[14] CDC, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019—United States, February 12 – March 28, 2020. MMWR Morb Mortal Wkly Rep 2020; 69: 382-86, https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm?s_cid=mm6913e2_w.

hazardous substances by, among other things, regularly testing storage tanks. Furthermore, EPA enforces the "general duty" clause requirements in CAA section 112(r)(1), which, unlike the section 112(r)(7) regulations, are not limited to pollutants that exceed certain threshold quantities. The general duty clause obligates facilities at which extremely hazardous substances are located to adhere to standards of care by taking the necessary steps to prevent releases of extremely hazardous substances and minimize any impacts should such a release occur.

75.     EPA has recently stated that its own enforcement of chemical accident safety regulations is key to the program's success, and that "inspections, sanctions, or increased threats of inspections and sanctions result in improved compliance not only at the evaluated or sanctioned facility, but also improve performance at other facilities, creating general deterrence." 84 Fed. Reg. 69,866-67.

76.     By effectively removing this "threat" of federal enforcement, the nonenforcement policy makes it more likely that companies—such as those referred to in the API's March 23 letter that allegedly have "physical challenges" associated with "on-site testing/monitoring/reporting requirements"—will fail to take crucial steps like chemical tank testing, making spills and other chemical accidents more likely, thereby increasing the risk of harm to the States' residents.

77.     Hundreds of facilities in the States are subject to the chemical accident safety requirements of section 112(r)(7) because they make, work with, or store hazardous chemicals above a quantity that could cause injury or death. Millions of people live within the "vulnerability zones" of these facilities, including over

9 million people just within the zones of facilities located in New York alone. Moreover, because a greater percentage of minorities and low-income individuals live closer to these facilities, EPA has found that these communities bear a disproportional share of harms resulting from accidents.[15] And under EPA's own rationale, the rate and seriousness of accidents at regulated facilities are likely to increase due to curtailed EPA enforcement pursuant to the nonenforcement policy.

78.     In addition, leak detection and repair requirements at oil and gas facilities serve to limit emissions of VOCs—which contribute to the formation of ozone pollution—and methane, which is one of the pollutants EPA has found to be endangering public health and welfare by contributing to climate change. Leaks of these pollutants from oil and gas facilities can and do occur regardless of whether active drilling operations are occurring. By removing or lessening the deterrent effect of EPA enforcement, the nonenforcement policy will lead to increased emissions from these facilities and resulting health harms in downwind areas.

79.     The nonenforcement policy also threatens to harm States and their residents with more water pollution. For example, New York's waters receive large amounts of pollution from sources located in upstream states in which EPA is the NPDES permitting authority. Long Island Sound, a New York estuary, suffers from low oxygen levels caused in significant part by discharges of nitrogen into the

---

[15] *See* EPA, Regulatory Impact Analysis for Reconsideration of the 2017 Amendments to the Accidental Prevention Release Requirements: Risk Management Program Requirements Under the Clean Air Act Section 112(r)(7) (Apr. 27, 2018) at 78-79, https://www.regulations.gov/document?D=EPA-HQ-OEM-2015-0725-0907.

Connecticut River before emptying into the Sound. Stormwater discharges from development sites in upstream states such as Massachusetts and New Hampshire are regulated directly by EPA under the NPDES Construction General Permit (CGP), which requires covered facilities to adopt technology-based pollution control measures, and to conduct frequent inspections to ensure the effectiveness of these controls. Suspension or curtailment of the CGP inspection requirements under the nonenforcement policy will increase the likelihood of excessive nitrogen discharges from these sites, to the detriment of water quality in the Long Island Sound.

## FIRST CLAIM FOR RELIEF
### The Nonenforcement Policy is *Ultra Vires* Agency Action

80.     The States reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

81.     The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

82.     As set forth above, numerous federal environmental laws, including the CAA, CWA, RCRA, SDWA, CERCLA, and EPCRA, mandate that regulated entities conduct compliance monitoring and reporting, and EPA has recognized the importance of these provisions to ensure compliance with substantive requirements in these laws that protect public health and the environment.

83.     The nonenforcement policy, in practice and effect, is a blanket waiver of these monitoring and reporting requirements. Such a waiver exceeds the discretion and authority Congress extended to EPA through these laws.

31

84.     As set forth above, federal environmental laws such as the CAA, CWA, and the SDWA give EPA or the President authority in emergency situations to take expedited action to protect public health or in the public interest, but none of these provisions applies here, and the agency did not invoke any such provision in issuing the nonenforcement policy.

85.     As such, the nonenforcement policy is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Therefore, the policy should be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(C).

**SECOND CLAIM FOR RELIEF**
**The Nonenforcement Policy is an Abdication of**
**EPA's Statutory Responsibilities**

86.     The States reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

87.     As set forth above, the nation's federal environmental laws and implementing regulations require that EPA implement and enforce those laws and regulations.

88.     EPA's action in adopting the nonenforcement policy amounts to an abdication of its responsibility to implement those laws and regulations.

89.     The nonenforcement policy is "in excess of [EPA's] statutory jurisdiction, authority, or limitations, or short of statutory right."

90.     As a result, the policy should be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(C).

## THIRD CLAIM FOR RELIEF
### The Nonenforcement Policy Was Promulgated
### Without Notice and Comment

91.    The States reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

92.    The APA provides that this Court "shall" "hold unlawful and set aside" agency rules adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

93.    Under the APA, a federal agency must publish notice of a proposed rulemaking in the Federal Register, 5 U.S.C. § 553(b), and "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* at § 553(c).

94.    The opportunity for public comment under 5 U.S.C. § 553(c) must be meaningful, which means the agency must allow comment on the relevant issues. An agency may only issue a rule after "consideration of the relevant matter presented" in public comments. 5 U.S.C. § 553(c).

95.    The nonenforcement policy constitutes an agency rule, within the meaning of 5 U.S.C. § 706(2)(D), and final agency action, within the meaning of 5 U.S.C § 704, and is therefore ripe for judicial review. By staking out a definitive position now that it will not enforce against noncompliance with monitoring and reporting requirements that regulated entities link to COVID-19, the nonenforcement policy is, in practice and effect, a statement of general policy that is subject to both notice-and-comment requirements of the APA and judicial review.

96.    The nonenforcement policy also changes existing regulations by extending the time periods for the accumulation of hazardous waste for very small quantity generators (40 C.F.R. § 262.14), small quantity generators (40 C.F.R. § 262.16), and large quantity generators (40 C.F.R. § 262.17).

97.    The nonenforcement policy also changes existing regulations by authorizing operators of animal feedlot operations to keep livestock under the CWA beyond the time period authorized by EPA regulations without triggering the obligations applicable to (i) Concentrated Animal Feedlot Operations (CAFOs) under 40 C.F.R. § 122.23 and (ii) medium and large CAFOs under 40 C.F.R. § 122.23.

98.    EPA did not provide the public with notice or an opportunity to comment on the nonenforcement policy. Had the States been provided an opportunity to comment on the policy, the States would have, *inter alia*, urged EPA to consider the potential impacts to public health in deciding on the proper scope and transparency of such action.

99.    As a result, the nonenforcement policy was adopted "without observance of procedure required by law" and should be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(D).

## FOURTH CLAIM FOR RELIEF
### The Nonenforcement Policy Is Arbitrary and Capricious

100.    The States reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

101.   The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

102.   The nonenforcement policy's provisions that effectively waive enforcement of noncompliance with monitoring and reporting under federal environmental laws were not based on consideration of all relevant data and factors. Despite its longstanding recognition that monitoring, reporting, and agency enforcement deter noncompliance, thereby reducing pollution, EPA failed—in the midst of a public health emergency—to consider the impacts of relaxing monitoring and reporting obligations, and agency enforcement, on human health and the environment. EPA's inexplicable failure to issue the policy without considering its resulting harm, especially on the health of low income and minority communities that often experience disproportionate harm from pollution and may be at greater risk of suffering adverse outcomes from COVID-19, was arbitrary and capricious.

103.   EPA acted arbitrarily and capriciously by making the nonenforcement policy applicable across the board to all industries and to virtually all monitoring and reporting requirements, assuming without evidence that the COVID-19 pandemic will prevent (or at least hinder) all industries from performing their monitoring and reporting obligations.

104.   EPA acted arbitrarily and capriciously by departing from its longstanding policy against issuing broad "no action" enforcement assurances without providing a reasoned explanation for that departure.

105.    As a result, the monitoring and reporting provisions of the policy should be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, the States respectfully request that this Court enter judgment:

A.      Declaring that the nonenforcement policy was adopted without observance of procedure required by law; is in excess of EPA's statutory jurisdiction, authority, or limitations; is not in accordance with law; and is arbitrary and capricious;

B.      Vacating the nonenforcement policy and permanently enjoining EPA from applying it;

C.      Awarding the State its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

D.      Granting such further relief as the Court deems just and proper.

Dated: May 13, 2020

Respectfully submitted,

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General

*S/ Samantha Liskow*[16]
SAMANTHA LISKOW
Assistant Attorney General
BENJAMIN COLE
Project Attorney
Environmental Protection Bureau

---

[16] Counsel for the State of New York represents that the other parties listed in the signature blocks on this document consent to this filing.

28 Liberty Street
New York, NY 10005
(212) 416-8479
samantha.liskow@ag.ny.gov

MICHAEL J. MYERS
Senior Counsel
MEREDITH LEE-CLARK
BRIAN M. LUSIGNAN
Assistant Attorneys General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
michael.myers@ag.ny.gov

PATRICK OMILIAN
Assistant Attorney General
Environmental Protection Bureau
Main Place Tower
350 Main Street, Suite 300A
Buffalo, NY 14202
(716) 853-8579

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
ATTORNEY GENERAL

*S/ David Zonana / SL (by permission)*
DAVID ZONANA
Supervising Deputy Attorney General
1515 Clay Street, Suite 2000
Oakland, CA 94612
Ph: (510) 879-1248
david.zonana@doj.ca.gov


FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

*S/ Daniel I. Rottenberg / SL (by permission)*
DANIEL I. ROTTENBERG*
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement and
Asbestos Litigation Division
Office of the Attorney General
Environmental Bureau
69 W. Washington St., 18th Floor
Chicago, IL 60602
Ph: (312) 814-3816
drottenberg@atg.state.il.us


FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

*S/ Steven J. Goldstein / SL (by permission)*
STEVEN J. GOLDSTEIN*
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
Ph: (410) 576-6414
sgoldstein@oag.state.md.us


FOR THE PEOPLE OF THE
STATE OF MICHIGAN

DANA NESSEL
Attorney General

*S/ Elizabeth R. Husa Briggs / SL (by permission)*
ELIZABETH R. HUSA BRIGGS
Assistant Attorney General
Michigan Department of the
Attorney General
525 W. Ottawa Street
P.O. Box 30758
Lansing, MI 48909
Ph: (517) 335-7603
Fax: (517) 335-1152
BriggsE1@michigan.gov

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General

*S/ Leigh Currie / SL (by permission)*
LEIGH K. CURRIE*
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 900
Saint Paul, MN 55101
Ph: (651) 757-1291
leigh.currie@ag.state.mn.us


FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

*S/ Paul Garrahan / SL (by permission)*
PAUL GARRAHAN*
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Ph: (503) 947-4593
Paul.Garrahan@doj.state.or.us


FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

*S/ Jill S. Abrams / SL (by permission)*
JILL S. ABRAMS
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
Ph: (802) 828-3171
jill.abrams@vermont.gov


FOR THE COMMONWEALTH OF VIRGINIA

MARK HERRING
Attorney General

*S/ Jerald R. Hess / SL (by permission)*
DONALD D. ANDERSON
Deputy Attorney General
PAUL KUGELMAN, JR.
Sr. Asst. Attorney General and Chief
JERALD R. HESS*
Assistant Attorney General
Environmental Section
202 North 9th Street
Richmond, VA 23219
(804) 371-8329
JHess@oag.state.va.us

*Pro Hac Vice applications to be filed*