# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF ILLINOIS, STATE OF MARYLAND, PEOPLE OF THE STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF OREGON, STATE OF VERMONT, and COMMONWEALTH OF VIRGINIA,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW WHEELER as Administrator of the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and SUSAN PARKER BODINE as Assistant Administrator of the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Defendants. | 20-CV-3714 (CM)<br>[rel 20-CV-3058] |

# MEMORANDUM OF LAW IN SUPPORT OF THE
# STATES' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS .......................................................................................... 1

    The COVID-19 pandemic ...................................................................................... 1

    The Policy ............................................................................................................... 2

    Federal Environmental Laws Impacted by the Policy .......................................... 4

ARGUMENT .............................................................................................................. 6

    I.   The States are Likely to Succeed on the Merits. .............................................. 6

        A.  The Policy is justiciable. .......................................................................... 6

            1.  The Policy is final agency action. ..................................................... 6

            2.  The Policy is not committed to agency discretion by law. .................. 8

        B.  The Policy exceeds EPA's statutory authority. ......................................... 9

            1.  The Policy is *ultra vires* agency action. ........................................... 9

            2.  The Policy is an abdication of EPA's statutory duties. ...................... 11

        C.  The Policy is arbitrary and capricious. .................................................... 13

            1.  EPA failed to consider the impact of the Policy on industry compliance and on public health and safety. ................................................................... 13

                a.  EPA did not consider the Policy's impacts on compliance with monitoring and reporting obligations and on facility pollution levels. ............ 13

                b.  EPA did not consider the Policy's impacts on public health and safety. ......... 15

            2.  EPA departed from settled agency policy against issuing broad "no action" enforcement policies without reasoned explanation. ............................. 16

        D.  The Policy violates APA notice and comment requirements for rulemakings. .......... 19

    II.  The Policy is Causing Irreparable Harm to the States. .................................... 20

        A.  Increased pollution resulting from the Policy threatens our residents. ....................... 21

B.  The Policy irreparably harms the States by forcing them to expend nonrecoverable costs in attempting to determine facility compliance. ................................................. 23

III. The Public Interest and Balance of the Equities Favor the States. ................................... 24

IV. An Injunction Without Geographic Limitation is Appropriate ........................................ 25

CONCLUSION .............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987)................................................................................................20

*Bauer v. Veneman,*
  352 F.3d 625 (2d Cir. 2003).................................................................................23

*Bennett v. Spear,*
  520 U.S. 154 (1997)...................................................................................................6

*Califano v. Yamasaki,*
  442 U.S. 682 (1979)................................................................................................25

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ...............................................................................20

*Cement Kiln Recycling Coal. v. EPA,*
  493 F.3d 207 (D.C. Cir. 2007)..............................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971)..................................................................................................8

*City of Arlington v. FCC,*
  569 U.S. 290 (2013)..................................................................................................9

*Cnty. of Santa Clara v. Trump,*
  250 F. Supp. 3d  497 (N.D. Cal. 2017) ...............................................................24

*Crowley Caribbean Transp., Inc. v. Pena,*
  37 F.3d 671 (D.C. Cir. 1994)..................................................................................9

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019).............................................................................................8

*Dist. of Columbia v. USDA*
  No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020)....................24

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016).....................................................................................16, 18

*FCC v. Fox Tel. Stations, Inc.,*
  556 U.S. 502 (2009).........................................................................................16, 18

*Gen. Elec. Corp. v. EPA*,
   290 F.3d 377 (D.C. Cir. 2002) .................................................................................7, 20

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) .........................................................................................25

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ..........................................................................................6, 8, 11

*Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.*,
   482 F.3d 79 (2d Cir. 2006) ...............................................................................................19

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ............................................................................................................9

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .............................................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................................. 13-14, 16

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010) ...............................................................................................20

*New York v. BB's Corner, Inc.*,
   No. 12 Civ. 1828, 2012 WL 2402624 (S.D.N.Y. June 25, 2012) .............................23

*New York v. EPA*,
   413 F.3d 3 (D.C. Cir. 2005) .............................................................................................17

*New York v. HHS*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............................................................................18

*New York v. Schweiker*,
   557 F. Supp. 354 (S.D.N.Y. 1983) ..................................................................................23

*New York v. United States Dep't of Homeland Sec.*,
   408 F. Supp. 3d 334 (S.D.N.Y. 2019) ............................................................................24

*Nken v. Holder*,
   556 U.S. 418 (2009) ...........................................................................................................24

*NRDC v. DOI*,
   397 F. Supp. 3d 430 (S.D.N.Y. 2019) ..............................................................................7

*NRDC v. DOI*,
   410 F. Supp. 3d 582 (S.D.N.Y., 2019) ...........................................................................16

*NRDC v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ........................................................................21

*NRDC v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018) ...........................................................................9, 21

*NRDC v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ...........................................................................7

*OSG Bulk Ships, Inc. v. U.S.*,
    132 F.3d 808 (D.C. Cir. 1998) ..........................................................................8

*Petroleum Commc'ns, Inc. v. FCC*,
    22 F.3d 1164 (D.C. Cir. 1994) .........................................................................17

*Riverkeeper, Inc. v. Collins*,
    359 F.3d 156 (2d Cir. 2004) ....................................................................9, 11-12

*Roman v. Korson*,
    918 F. Supp. 1108 (W.D. Mich. 1995) ..............................................................12

*S.C. Coastal Conservation League v. Pruitt*,
    318 F. Supp. 3d 959 (D.S.C. 2018) ..................................................................25

*Seife v. HHS*,
    18 Civ. 11462 (NRB), 2020 U.S. Dist. LEXIS 31486 (S.D.N.Y. Feb. 24,
    2020) .........................................................................................................11

*Sierra Club v. EPA*,
    705 F.3d 458 (D.C. Cir. 2013) ........................................................................10

*Sierra Club v. Simkins Indus., Inc.*,
    847 F.2d 1109 (4th Cir. 1988) ........................................................................14

*Trump v. Int'l Refugee Assistance Project*,
    137 S. Ct. 2080 (2017) ...................................................................................25

*United States v. Ohio Edison*,
    276 F. Supp. 2d 829 (S.D. Ohio 2003) ..............................................................4

*Velesaca v. Decker*,
    No. 20 Civ. 1803 (AKH), 2020 WL 2114984 (S.D.N.Y. May 4, 2020) ...................25

*Waterkeeper Alliance v. EPA*,
    853 F.3d 527 (D.C. Cir. 2017) ........................................................................10

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) .........................................................................................24

**FEDERAL STATUTES**

5 U.S.C.
§ 553(b)(3)(A)..................................................................................................19
§ 701(a)(2)........................................................................................................6
§ 702.................................................................................................................20
§ 704..................................................................................................................6
§ 706(2)(A).......................................................................................................13
§ 706(2)(C)....................................................................................................9, 12
§ 706(2)(D)......................................................................................................20

33 U.S.C.
§ 1318................................................................................................................5
§ 1318(a)(A).....................................................................................................10
§ 1319................................................................................................................4
§ 1319(a).......................................................................................................4, 10
§ 1319(b)..........................................................................................................10
§ 1342(b)...........................................................................................................4
§ 1364(a)..........................................................................................................11
§ 1365................................................................................................................4

42 U.S.C.
§ 300g-3...........................................................................................................11
§ 300g-3(c)(4)....................................................................................................5
§ 300j-4(a).......................................................................................................10
§ 6926(b)...........................................................................................................4
§ 6927................................................................................................................5
§ 6928...........................................................................................................4, 11
§ 6928(a)(2)......................................................................................................4
§ 6934................................................................................................................5
§ 6934(a)..........................................................................................................10
§ 6972................................................................................................................4
§ 7410(a)(2)(B)..................................................................................................4
§ 7410(f)..........................................................................................................11
§ 7413................................................................................................................4
§ 7413(b)......................................................................................................10-11
§ 7603..............................................................................................................11
§ 7604................................................................................................................4
§ 7661a(b)(2)...................................................................................................10
§ 9603(a).........................................................................................................10
§ 11004(a).......................................................................................................10
§ 11023..............................................................................................................5
§ 11054............................................................................................................11

**FEDERAL REGULATIONS**

40 C.F.R. pt. 75.................................................................................................3

40 C.F.R.
    § 68.56(d)...................................................................................................23-24
    § 68.73(d)...................................................................................................23-24
    § 70.6(a)(3) ....................................................................................................11

84 Fed. Reg. 50,244 (Sept. 24, 2019) ...........................................................................22

84 Fed. Reg. 69,834 (Dec. 19, 2019) ...................................................................15, 23

85 Fed. Reg. 15,337 (Mar. 18, 2020)...............................................................................1

85 Fed. Reg. 22,362 (Apr. 22, 2020) ...............................................................................3

**MISCELLANEOUS AUTHORITIES**

Brief of *Amici Curiae* Cynthia Giles and Steven A. Herman, *NRDC v. Bodine* No.
    20-cv-3058  (S.D.N.Y. May 6, 2020) ...................................................................17

California EPA,  *CalEPA Issues Statement on Compliance with Regulatory*
    *Requirements During the COVID-19 Emergency*,
    https://calepa.ca.gov/2020/04/15/calepa-statement-on-compliance-with-
    regulatory-requirements-during-the-covid-19-emergency/ (Last visited June 5,
    2020) ....................................................................................................................19

 Illinois EPA,  *Compliance Expectation Statement*,
    https://www2.illinois.gov/epa/topics/Documents/Agency_Compliance_Expect
    ations_Statement.pdf (Last visited June 5, 2020) ..................................................19

Illinois EPA,  *COVID-19 Enforcement Discretion Issues.pdf*,
    https://www2.illinois.gov/epa/topics/Documents/COVID-
    19%20Enforcement%20Discretion%20Issues.pdf (Last visited June 5, 2020).....................19

Maryland MDE, *MDE COVID-19 Update*,
    https://mde.maryland.gov/Pages/MDE-COVID-19-Update.aspx (Last visited
    June 5, 2020)........................................................................................................19

Minnesota PCA, *COVID-19 and regulatory flexibility,*
    https://www.pca.state.mn.us/covid-19/covid-19-and-regulatory-flexibility
    (Last visited June 5, 2020) ..................................................................................19

Minnesota PCA., *Requests for MPCA regulatory flexibility due to COVID-19,*
    https://www.pca.state.mn.us/covid-19/requests-mpca-regulatory-flexibility-
    due-covid-19 (Last visited June 5, 2020)..............................................................19

Oregon DEQ , *DEQ response to COVID-19*,
    https://www.oregon.gov/deq/Pages/covid-19.aspx (last visted June 5, 2020)........................19

Vermont DEQ , *Agency of Natural Resources COVID – 19 State of Emergency Enforcement and Compliance Guidance Document March 31, 2020,* https://anr.vermont.gov/sites/anr/files/emergencyinfo/enforcement-discretion-covid-19-guidance.pdf (Last visited June 5, 2020)...................................................19

Virginia DEQ, *COVID-19 Compliance and Enforcement Guidance,* https://www.ecos.org/wp-content/uploads/2020/03/Virginia-COVID-19compliance.pdf (Last visited June 5, 2020) ......................................................19

## INTRODUCTION

In the midst of the COVID-19 pandemic, the U.S. Environmental Protection Agency (EPA)—whose core mission is to protect public health and the environment—issued a broad policy that effectively waives industry compliance with pollution monitoring and reporting obligations, the bedrock requirements of federal environmental laws. EPA issued the policy without considering its resulting impacts on public health despite EPA's longstanding recognition that monitoring and reporting requirements are critical not only to determining industry compliance with pollution limits but also deterring facilities from violating those limits. Because the policy exceeds EPA's statutory authority and is arbitrary and capricious, plaintiff States are likely to succeed in having the policy vacated. However, if the policy remains in effect while this litigation is pending, the increased pollution it incentivizes will irreparably harm the States before the policy can be set aside. A preliminary injunction is therefore warranted.

## STATEMENT OF FACTS

**The COVID-19 pandemic**

On March 11, 2020, the World Health Organization designated coronavirus disease 2019 ("COVID-19") a global pandemic. Declaration of Anthony Dvarskas, ¶ 4. On March 13, President Trump declared a national emergency. *See* 85 Fed. Reg. 15,337 (Mar. 18, 2020). COVID-19 infects the upper and lower parts of the respiratory tract, causing inflammation. Dvarskas Decl., ¶ 4. COVID-19 can cause mild to severe illness, and people who are older or who have existing chronic medical conditions, such as heart disease, lung disease, or diabetes, may be at higher risk of serious illness and death. *Id.*, ¶ 6.

The pandemic has swept across the country, causing devastating public health and economic consequences. There are more than 1.8 million COVID-19 cases and over 105,000 deaths reportedly caused by COVID-19 in the U.S. Dvarskas Decl., ¶ 5. About one-quarter of

1

those deaths—more than 24,000—have occurred in New York. *Id.*, ¶ 5. COVID-19 deaths have disproportionately occurred in minority and low-income communities. *Id.*, ¶ 7.

**The Policy**

On March 26, 2020, EPA issued a policy entitled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program." Declaration of Patrick Omilian, Exh. 1 (Policy). EPA issued the Policy just days after receiving a letter from the American Petroleum Institute (API) requesting that EPA "temporarily waiv[e] non-essential compliance obligations." *See* Omilian Decl., Exh. 2 at 2. The Policy has no end date; instead, EPA states that it will assess the need for the Policy on a continuing basis and update it if necessary. Policy at 1. For its duration, EPA "will exercise the enforcement discretion specified [] for noncompliance" in the Policy instead of "otherwise applicable EPA enforcement response policy." *Id.*

The Policy covers multiple areas and statutes: compliance monitoring and reporting, consent decree obligations, facility operations, drinking water systems, and critical infrastructure. *Id.* at 3-7. The compliance monitoring and reporting section of the Policy states:

> In general, the EPA does not expect to seek penalties for violations of routine compliance monitoring, integrity testing, sampling, laboratory analysis, training, reporting, and certification obligations in situations where the EPA agrees that COVID-19 was the cause of the noncompliance and the entity provides supporting documentation to the EPA upon request.

*Id.* at 3. EPA subsequently reiterated in a press release that it "will not" seek penalties for noncompliance provided conditions in the Policy are met. Omilian Decl., Exh. 3. This section of the Policy applies to obligations for which API sought a temporary waiver, including stack testing, fenceline monitoring, tank integrity testing, effluent sampling and testing, continuous emissions monitoring systems (CEMS), and leak detection and repair (LDAR), among others. *See* Policy at 3. These are used to determine compliance for a wide range of pollutants: fenceline

2

monitoring measures hazardous air pollutants, LDAR is used to detect and fix leaks of pollutants such as volatile organic compounds (which contribute to ozone pollution), and CEMS monitor sulfur dioxide and nitrogen oxides (which contribute to particulate matter and/or ozone). *See* Omilian Decl., Exh. 4 (EPA, Fenceline Monitoring) & Exh. 5 (EPA, LDAR Best Practices Guide); *see* 85 Fed. Reg. 22,362 (Apr. 22, 2020) & 40 C.F.R. Part 75 (rules concerning CEMS).

The Policy states that regulated entities "should" use existing procedures to report noncompliance with monitoring and reporting requirements, or if not "reasonably practicable" due to COVID-19, they "should" maintain this information internally and provide it to EPA or state agencies upon request. Policy at 3. Nothing requires EPA to make such information about noncompliance available to states or the public, even if companies choose to report their noncompliance to EPA. Indeed, without such a requirement, there is no way for EPA to determine whether "COVID-19 was the cause of the noncompliance," and any suggestion that EPA will make such a determination *before* it decides not to enforce is therefore misleading.

Despite the Policy's broad scope, EPA failed to cite any evidence that facilities could not continue to perform these monitoring and reporting functions. Instead, EPA stated that potential worker shortages and travel and social distancing restrictions "may" affect facility operations and the availability of personnel to timely analyze samples and provide results. *Id.* at 2.

Although EPA "expects" facilities will continue to comply with mandatory pollution limits, *id.* at 4-5, it fails to explain how EPA, states, or the general public will learn of noncompliance if facilities stop monitoring and reporting whether they are meeting those standards. In addition, the Policy does not require companies to inform EPA of their noncompliance with regulatory or permit limits. Even where operations may create an "acute risk

3

or an imminent threat to human health or the environment," EPA merely directs owners that they "should" promptly contact the appropriate regulatory authority. *Id.* at 4.

Nowhere does the Policy acknowledge that EPA considered its potential adverse impacts on public health, including increased pollution and a lack of information about pollution. Nor did EPA provide notice to the public or an opportunity for public comment before issuing the Policy.

**Federal Environmental Laws Impacted by the Policy**

Congress entrusted EPA with enforcing federal environmental laws. *See*, *e.g.*, 42 U.S.C. § 7413 (Clean Air Act) (CAA); 33 U.S.C. § 1319 (Clean Water Act) (CWA); 42 U.S.C. § 6928 (Resource Conservation and Recovery Act) (RCRA). EPA may delegate certain enforcement and implementation powers to states, local governments, or tribes. *See, e.g.,* 33 U.S.C. § 1342(b) (CWA discharge permits); 42 U.S.C. § 6926(b) (hazardous waste management under RCRA). Where such delegation has occurred, the state, local agency, or tribe becomes the primary enforcer of the federal program, with continued oversight from EPA. *See* 33 U.S.C. § 1319(a) (CWA); 42 U.S.C. § 6928(a)(2) (RCRA). That continued oversight—including EPA's ability to commence enforcement actions—is especially important to ensure compliance with federal requirements that protect states from pollution that originates in upwind or upstream states. *See, e.g.*, *United States v. Ohio Edison*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) (EPA suit against Ohio coal-fired power plants for harming air quality in New York and other downwind states). Federal environmental laws also contain citizen suit provisions, which authorize any person (including a state) to sue to address violations of these statutes where EPA or a delegated state is not taking action to address noncompliance. *See, e.g.*, 42 U.S.C. § 7604 (CAA); 33 U.S.C. § 1365 (CWA); 42 U.S.C. § 6972 (RCRA).

Monitoring and reporting by regulated entities are fundamental to the effective operation of these laws. *See, e.g.*, CAA: 42 U.S.C. §§ 7410(a)(2)(B) (state implementation plans),

4

7412(r)(7)(A), (B) (chemical accident prevention), 7414 (information requests), 7661a (operating permits); CWA: 33 U.S.C. § 1318 (monitoring and reporting to determine compliance with effluent limitations and pretreatment standards); RCRA: 42 U.S.C. §§ 6927, 6934 (monitoring and reporting of hazardous waste facilities); Safe Drinking Water Act (SDWA): 42 U.S.C. § 300g-3(c)(4) (requiring reporting by public water system operators on violations and regulated contaminant levels); Emergency Planning and Community Right-To-Know Act (EPCRA): 42 U.S.C. § 11023 (toxic release inventory program).

EPA recognizes that "[c]ompliance monitoring is a key component of any effective environmental compliance and enforcement program." Omilian Decl., Exh. 6 (EPA web page on compliance). According to EPA, the primary aims of monitoring and reporting are:

- assessing and documenting compliance with permits and regulations
- supporting the enforcement process through evidence collection
- monitoring compliance with enforcement orders and decrees
- creating deterrence, and
- providing feedback on implementation challenges to permit and rule writers.

Omilian Decl., Exh. 7 (EPA compliance web page); *see also id.*, Exh. 8 (EPA CAA enforcement web page states that "monitoring ensures that the regulated community obeys environmental laws/regulations through on-site inspections and record reviews that can lead to enforcement when necessary"), and *id.*, Exh. 9 (EPA 2014 memorandum stating that "monitoring [under the CWA] is a cornerstone of EPA's program to protect and restore water quality").

**This Litigation**

Before filing this case, State Attorneys General sent EPA letters objecting to the overbroad nature of the Policy. The California Attorney General urged EPA, at a minimum, to require facilities to report noncompliance with mandatory obligations to EPA and state authorities, and to make such reports public "so that the impacted communities can take

5

necessary steps to mitigate the potential impacts from such noncompliance." Omilian Decl.,
Exh. 10 at 3. Several days later, fourteen State Attorneys General sent EPA a letter objecting to
EPA's failure to consider the Policy's impact on public health, especially to minority and low-
income communities suffering disproportionately from COVID-19. *Id.*, Exh. 11 at 2. The State
Attorneys General asked EPA to rescind the Policy. *Id.* On May 13, after EPA refused to rescind
or modify the Policy, nine of the Attorneys General commenced this litigation.

On May 19, citing an "economic emergency" caused by COVID-19, President Trump
issued an Executive Order directing federal agencies to, *inter alia*, consider whether "temporary"
policies put in place by agencies during the public health emergency—such as the Policy—
should be made permanent to promote economic recovery. Omilian Decl., Exh. 12 at 3, 7.

## ARGUMENT

### I.   The States are Likely to Succeed on the Merits.

The States are likely to prevail on the merits of their claims. The Policy is reviewable by
the Court, exceeds EPA's authority under statute, is arbitrary and capricious, and was issued
without complying with notice and comment requirements.

### A.   The Policy is justiciable.

Judicial review under the Administrative Procedure Act (APA) is available for final
agency actions that are not committed to agency discretion by law. 5 U.S.C. §§ 701(a)(2), 704;
*Heckler v. Chaney*, 470 U.S. 821, 828 (1985). The Policy meets both criteria.

### 1.   The Policy is final agency action.

The Policy constitutes final agency action under *Bennett v. Spear,* 520 U.S. 154, 177-78
(1997): it marks the consummation of the agency's decision-making process, i.e., it is not
"merely tentative or interlocutory" in nature but rather an action "by which rights or obligations
have been determined, or from which legal consequences will flow." The Policy marks the

consummation of EPA's decision making on violations of monitoring and reporting obligations while the Policy is in effect. *See NRDC v. Wheeler*, 955 F.3d 68, 78-80 (D.C. Cir. 2020) (EPA guidance document delineating scope of regulations on interim basis marked consummation of agency's decision making for that period). By assuring that it "will not" seek civil penalties for violations of monitoring and reporting obligations, Omilian Decl., Exh. 3, EPA intends for the Policy to provide safe harbor to regulated entities that do not comply with these obligations.

The possibility that EPA may later review a facility's determination that its violations of monitoring and reporting requirements were in fact caused by COVID-19, *see* Policy at 3, does not render the Policy "tentative" because the Policy neither requires facilities to report noncompliance nor keep records documenting that COVID-19 was the cause of noncompliance. *See id.* (facilities "should" report noncompliance, or if not reasonably practicable, "should" maintain this information internally). The possibility that EPA *may* conduct after-the-fact reviews of facility determinations (if it learns of their noncompliance) does not make the Policy non-final for judicial review. *See NRDC v. DOI*, 397 F. Supp. 3d 430, 447-48 (S.D.N.Y. 2019) (finding DOI Solicitor's opinion on scope of criminal liability under Migratory Bird Treaty Act final agency action despite the possibility of future enforcement or related agency proceedings).

The Policy also satisfies the "legal consequence" prong of *Bennett*. By its terms, the Policy became binding on EPA upon its issuance, both prospectively and retroactively. Policy at 1. Through the mandatory "will" language used repeatedly in the Policy and in a subsequent press release, EPA stated its intent to be bound by the Policy concerning violations of monitoring and reporting requirements. *Id.* at 1-3; Omilian Decl., Exh. 3 at 1. *See Gen. Elec. Corp. v. EPA,* 290 F.3d 377, 383 (D.C. Cir. 2002) (national guidance document binding on EPA was final agency action).

**2.   The Policy is not committed to agency discretion by law.**

The bar to review under APA section 701(a)(2) for "agency action [] committed to agency discretion by law" only applies in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). The Supreme Court recently affirmed that this exception to the presumption of reviewability should be applied "quite narrowly." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (quotation marks omitted). Regarding enforcement policies, courts distinguish between a "single-shot non-enforcement decision," which is generally unreviewable, and "an agency's adoption of a general enforcement policy," which "is subject to judicial review." *OSG Bulk Ships, Inc. v. U.S.*, 132 F.3d 808, 812 (D.C. Cir. 1998). By announcing that EPA will not seek civil penalties for violations of a category of requirements under a wide swath of environmental laws, the Policy is no "single-shot" enforcement decision.

Nor is this a case with "no law to apply." The statutory and regulatory provisions cited in the States' complaint concerning monitoring, enforcement, and emergency authority provide standards to evaluate whether the Policy exceeds EPA's authority. *See* Complaint, ¶¶ 42, 46-59. As explained in Point I.B.1, *infra*, these laws mandate monitoring and reporting to demonstrate compliance, direct EPA to enforce such requirements, and provide limited emergency powers to deviate from that framework. "Where Congress has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2)." *Heckler*, 470 U.S. at 834-35.

The Policy is alternatively reviewable as an abdication of EPA's statutory responsibilities. *See Heckler*, 407 U.S. at 833 n.4 (presumption against reviewability under § 701(a)(2) may also be overcome if agency "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities"); *see*

*Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994) (noting "special risks" that general enforcement policies will result in "abdication" of enforcement authority). An agency "can be viewed as abdicating its statutory duties" if it "has established a policy not to protect adequately public health and safety with respect to" regulated facilities. *See Riverkeeper, Inc. v. Collins*, 359 F.3d 156, 168 (2d Cir. 2004). EPA's commitment not to enforce against violations of monitoring and reporting obligations if facilities self-determine that COVID-19 was the cause—without any requirement of agency review of that determination—is an abdication of EPA's statutory duty to protect public health and the environment. *See* Point I.B.2, *infra*.

**B.   The Policy exceeds EPA's statutory authority.**

Because the Policy is an *ultra vires* agency action or, alternatively, an abdication of EPA's enforcement authority, it should be set aside as being "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

**1.   The Policy is *ultra vires* agency action.**

In determining if an agency action exceeds statutory authority, "the question . . . is always whether the agency has gone beyond what Congress has permitted it to do." *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013). An agency has "no power to act . . . unless and until Congress confers powers upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and where Congress confers power to act by statute, the agency is constrained by those terms. *See NRDC v. NHTSA*, 894 F.3d at 108.

In issuing the Policy, EPA cited no statutory authority allowing it to effectively waive mandatory monitoring and reporting obligations. Indeed, none exists. Congress established these mandatory monitoring and reporting requirements through the passage of numerous environmental laws, and EPA's blanket waiver contravenes such intent.

9

The Policy undermines a host of environmental statutes that require EPA to establish monitoring and reporting programs. For example, in Title V of the Clean Air Act, Congress required EPA to establish a permit program for certain sources of air pollution that "shall include . . . [m]onitoring and reporting requirements." 42 U.S.C. § 7661a(b)(2). In section 165(e)(2), 42 U.S.C. § 7475(e)(2), Congress mandated a "rigid[]" system of preconstruction monitoring in certain areas, with "no room for exemptions." *Sierra Club v. EPA*, 705 F.3d 458, 469 (D.C. Cir. 2013). Similarly, under the Clean Water Act, Congress directed that EPA "shall require the owner or operator of a point source" to, among other things, "make such reports," to "install, use, and maintain such monitoring equipment," and to "sample such effluents" as may be "reasonably require[d]." 33 U.S.C. § 1318(a)(A). CERCLA and EPCRA establish an interlocking and "sweeping reporting mandate" for releases of hazardous waste, subject to limited, narrow exemptions. *Waterkeeper Alliance v. EPA*, 853 F.3d 527, 534-35 (D.C. Cir. 2017); *see* 42 U.S.C. § 9603(a) (CERCLA); *id.* § 11004(a) (EPCRA). None of these statutes authorize EPA to suspend or waive compliance with the relevant monitoring program once it has been created. *See also* RCRA, 42 U.S.C. § 6934(a); SDWA, 42 U.S.C. § 300j-4(a).

These statutes not only create monitoring and reporting programs, but require EPA to enforce those requirements. For example, the Clean Water Act provides that EPA "shall" issue a compliance order or commence a civil enforcement action against "any person" who has violated the terms of certain federal- or state-issued permits, including relevant monitoring and reporting requirements. 33 U.S.C. § 1319(a), (b). Likewise, the Clean Air Act provides that EPA "shall, as appropriate" commence a civil enforcement action against the owner or operator of a facility that has violated provisions of the Act, an applicable implementation plan, or its permit, both of which would include monitoring and reporting requirements as a core component. 42 U.S.C.

§ 7413(b); *see* 40 C.F.R. § 70.6(a)(3) (monitoring and reporting requirements for Title V operating permits). Other environmental statutes similarly direct EPA to enforce against statutory violations, including monitoring and reporting requirements. *See* 42 U.S.C. § 300g-3 (SDWA); *id.* § 6928 (RCRA); *id.* § 11054 (EPCRA). These statutes do not authorize EPA to effectively waive the monitoring and reporting requirements included by statute, regulation, or permit.

This absence of statutory authority stands in contrast to the explicit emergency powers Congress *did* provide under environmental laws. "Emergency powers" given to EPA involve situations in which imminent harm from pollution to public health and the environment requires immediate agency action. *See, e.g.*, 42 U.S.C. § 7603 (CAA provision authorizing Administrator to file suit to "immediately restrain any person" causing or contributing to such pollution or "to take such other action that may be necessary"); 33 U.S.C. § 1364(a) (substantially same language in CWA). By contrast, the only emergency power expressly provided to *waive* environmental legal requirements is the Clean Air Act's provision that allows the President (not EPA) to temporarily waive requirements of state implementation plans where the President has declared an "*energy* emergency." 42 U.S.C. § 7410(f) (emphasis added).

The States are not contesting EPA's authority to decide "appropriate" enforcement on a case-by-case basis. *See*, *e.g.* 42 U.S.C. § 7413(b). EPA could have issued guidance describing how it would consider the impact of COVID-19 on a facility's ability to comply with monitoring and reporting obligations in particular enforcement actions. That is the type of approach EPA has taken in the past and that the States are taking now, *see* Point I.C.2, *infra*. EPA instead chose to "temporarily waive" monitoring and reporting requirements. This it may not lawfully do.

### 2. The Policy is an abdication of EPA's statutory duties.

The Policy also abdicates EPA's statutory duties to protect public health and the environment. *Heckler*, 470 U.S. at 833, n. 4; *Riverkeeper*, 359 F.3d at 168; *Seife v. HHS*, 18 Civ.

11

11462 (NRB), 2020 U.S. Dist. LEXIS 31486, *49-50 (S.D.N.Y. Feb. 24, 2020) (discussing cases finding abdication where there was an "express policy of nonenforcement"). A policy that amounts to an abdication of an agency's statutory duties must be set aside as not in accordance with law. 5 U.S.C. § 706(2)(C); *see Roman v. Korson*, 918 F. Supp. 1108, 1112-13 (W.D. Mich. 1995) (granting summary judgment against agencies that had abdicated their statutory duties by failing to enforce regulations designed to protect migrant farmworkers).

EPA's announced policy that it will not enforce against monitoring and reporting violations if facilities determine that COVID-19 was the cause—without any requirement of EPA review of those determinations before or after—constitutes an abdication of EPA's statutory duty to protect public health and the environment. Congress required monitoring and reporting under federal environmental laws and directed EPA to prosecute violations of those requirements. *See* Point I.A.1, *supra*. Moreover, EPA acknowledges that compliance with monitoring and reporting requirements are integral to protecting human health and the environment. Omilian Decl., Exhs. 6-9; *see also* Declaration of Jay Shimshack, ¶ 12.

In considering an abdication argument in *Riverkeeper*, the Second Circuit stated that the Nuclear Regulatory Commission would have abdicated its statutory duties had it "established a policy not to protect adequately public health and safety with respect to nuclear plants." 359 F.3d at 168. Here, EPA has established a policy not to protect adequately public health and safety with respect to pollution from regulated facilities. The Policy arguably goes a step further than the one described in *Riverkeeper* because it also impairs the rights of citizens, including the States, to enforce environmental laws by reducing the availability of evidence used in citizen suits to enforce environmental laws. Shimshack Decl. ¶ 29; Declaration of Peter Washburn ¶ 12. For these reasons, the Policy should be vacated as not in accordance with law. 5 U.S.C. § 706(2)(C).

### C.  The Policy is arbitrary and capricious.

The Court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if, *inter alia*, the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).

#### 1.  EPA failed to consider the impact of the Policy on industry compliance and on public health and safety.

The Policy is arbitrary and capricious because EPA failed to consider—during a public health emergency—the impacts to public health of effectively waiving monitoring and reporting obligations that EPA recognizes are important to reduce pollution. *State Farm*, 463 U.S. at 43.

##### a.  EPA did not consider the Policy's impacts on compliance with monitoring and reporting obligations and on facility pollution levels.

As noted above, monitoring and reporting serve two critical functions in environmental laws: enabling regulators and the general public to know whether facilities are limiting their pollution as required by law, and deterring violations of pollution limits. Regarding the first of those purposes, self-monitoring—such as taking water samples and searching for emission leaks—and reporting is the primary way that EPA and the states determine whether facilities are complying with environmental regulations. Shimshack Decl. ¶¶ 7-9. If facilities are not performing their monitoring obligations, they may not know if they are meeting limits on air, water, and waste pollution; pollution harms could then go undetected. *Id.* ¶ 9. After members of Congress raised this concern about the Policy, EPA apparently acknowledged that the lack of required monitoring and reporting under the Policy could leave EPA enforcement staff unable to determine whether facilities were in compliance. *See* Omilian Decl., Exh. 13 at 4 (Letter from Members of Congress to EPA). Moreover, on-site inspections by regulators are often based on

information provided in facilities' self-monitoring and reporting, making facilities' compliance with those requirements key to enforcement. Shimshack Decl. ¶ 7, n.5. And even if EPA or states are able to take future enforcement action to address noncompliance of pollution limits resulting from the Policy, the harms to public health and the environment will have already occurred.

EPA also recognizes the importance of monitoring and reporting to deter violations of environmental obligations, including regulatory limits and permit terms designed to protect public health. Omilian Decl., Exhs. 6-9; *see Sierra Club v. Simkins Indus., Inc*., 847 F.2d 1109, 1115 (4th Cir. 1988) ("[M]onitoring obligations . . . are central to adequate administration and enforcement of limits on substantive discharges."). As explained in the declaration of Prof. Jay Shimshack, an expert in the field of environmental compliance, facility self-reporting has "direct benefits for pollution and compliance" because it enables personnel to identify correctable problems causing pollution and reaffirms "that government agencies and the public care about pollution and will respond to noncompliance." Shimshack Decl. ¶ 9. Studies demonstrate that facility operations are sensitive to changes at regulatory agencies such as budget shortfalls, new leadership or policies, and reduced enforcement. *Id.* ¶ 15.

In issuing a policy effectively waiving monitoring and reporting obligations, EPA failed to consider its own findings that those requirements inform regulators and the general public of pollution levels and deter violations of pollution limits. By not examining the relevant data and articulating a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made," EPA acted arbitrarily and capriciously. *See State Farm*, 463 U.S. at 43 (internal quotation and citation omitted).

EPA's suggestion in the Policy that states can still chart a different enforcement course overlooks the severe financial constraints facing states because of the COVID-19 crisis. And

even for those states with adequate funding to administer delegated federal programs, EPA's continued oversight and enforcement presence serves an important function for effective national regulation. Shimshack Decl. ¶ 19. For example, EPA enforces against large-scale emitters, like large firms that operate across states, and addresses large-scale problems, such as transboundary pollution involving dozens of power plants, in ways that state and local agencies cannot. *Id.*

### b. EPA did not consider the Policy's impacts on public health and safety.

The Policy applies to tens of thousands of mid-sized and large facilities. Shimshack Decl. ¶ 11. These facilities generate large amounts of pollutants, many of which harm public health. *See id.* ¶¶ 24-26. EPA has determined that incremental changes in air pollution are causally associated with harms to cardiovascular, respiratory, nervous and reproductive systems as well as health conditions like asthma and cancer. *Id.* The agency has found a likely causal association between air pollutants such as fine particulate matter and premature death. *Id.* EPA likewise has concluded that reductions in air, water, and waste pollution increase life expectancy and reduce cancer mortality, heart failure, infertility and birth abnormalities, kidney disease, neurological illness, and developmental problems in children. *Id.* ¶ 25.

EPA further recognizes that pollution disproportionately impacts minorities and low-income communities, who more often reside closer to the "fenceline" of facilities. Omilian Decl., Exh. 14 at 1 (EPA Environmental Justice Rpt.); 84 Fed. Reg. 69,834, 69,853-54 (Dec. 19, 2019) (facilities regulated under CAA's chemical accident safety program are more often located in these communities). Evidence suggests that environmental enforcement under the Clean Air Act and Clean Water Act is *already* less frequent in poorer communities. Shimshack Decl. ¶ 26.

In addition to this existing backdrop of public health concerns, mounting evidence regarding the incidence of COVID-19 in low-income and minority communities amplifies the importance of considering the Policy's impact on public health. Members of minority and low-

income communities are dying from COVID-19 at a significantly higher rate than the general

population. Dvarskas Decl., ¶ 7; *see also* Omilian Decl., Exh. 15 (EPA press release noting

disproportionate impacts of COVID-19 on environmental justice communities). In addition, a

recent Harvard School of Public Health analysis found an increase in COVID-19 death rates in

individuals exposed to slightly higher concentrations of long-term fine particulate matter

pollution, *see* Dvarskas Decl. ¶ 9. As noted above, minority and low-income communities are

disproportionately exposed to such pollution.

 EPA failed to consider the potential impacts of increased pollution from industry

noncompliance on the general population or on minority and low-income communities more

likely to be adversely impacted. The Policy's passing reference to public health and safety—

"EPA expects all regulated entities to continue to manage and operate their facilities in a manner

that is safe and that protects the public and the environment," Policy at 4—is insufficient to show

that EPA actually considered those impacts of the Policy. *See NRDC v. DOI*, 410 F. Supp. 3d

582, 596 (S.D.N.Y., 2019) ("'Stating that a factor was considered . . . is not a substitute for

considering it.") (citations and internal quotations omitted)). EPA issued the Policy ostensibly to

protect public health during the COVID-19 pandemic, yet it failed in fact to consider the Policy's

likely impact on public health from pollution harms, undeniably an "important aspect of the

problem." *State Farm*, 463 U.S. at 43.

 **2. EPA departed from settled agency policy against issuing broad "no action" enforcement policies without reasoned explanation.**

 To change existing policy, an agency "must at least display awareness that it is changing

position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v.

Navarro*, 136 S. Ct. 2117, 2125 (2016) (internal quotations omitted); *FCC v. Fox Tel. Stations,

Inc.*, 556 U.S. 502, 515 (2009). EPA has long refused to promise that it will not enforce the law

against a regulated entity in advance of the entity taking a particular action. In 1984, EPA

adopted a written policy against these "no action assurances," and has reiterated the policy in the

years since. Omilian Decl., Exh. 16 (EPA, Policy Against "No Action" Assurances (Nov. 16,

1984)); Brief of *Amici Curiae* Cynthia Giles and Steven A. Herman, *NRDC v. Bodine*

(S.D.N.Y.), No. 20-cv-3058 (CM) [rel.], Dkt. 36-1, at 12 (May 6, 2020) (explaining that EPA has

issued such assurances in "extremely unusual cases" where "clearly necessary to serve the public

interest" and there is "no other mechanism available").

Here, EPA did not "display awareness that it is changing position" from its existing

policy against no action assurances. Rather, EPA characterized the Policy as a mere exercise in

enforcement discretion. As explained above, however, the agency's nod in the direction of

possible future enforcement is belied by its failure to obligate facilities to notify EPA of

noncompliance or keep records of their determination that COVID-19 was the cause of such

noncompliance. Both requirements are necessary to ensure the viability of future enforcement.

*See* Point I.A, *supra*; *New York v. EPA*, 413 F.3d 3, 34-36 (D.C. Cir. 2005) (remanding CAA

recordkeeping provision under which facilities' obligations to keep records was based on their

own belief that there was a "reasonable possibility" that their emissions would increase, where

EPA failed to explain how it could ensure compliance without records of such determinations).

Nor did EPA provide good reasons for its effective waiver of monitoring and reporting

requirements. That the pandemic "may" constrain the ability of some facilities to perform these

obligations does not justify the assumption that all facilities cannot. EPA did not explain why

facilities that are fully staffed and operational cannot perform monitoring and reporting, and did

not articulate why such entities should be treated the same as a facility with actual compliance

impediments. *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("An

17

agency must justify its failure to take account of circumstances that appear to warrant different treatment for different parties."). Furthermore, agencies have a greater responsibility to explain their actions where they choose to depart from longstanding policies relied upon by third parties. *See FCC v. Fox*, 556 U.S. at 515. That principle applies here because states rely on facility monitoring and reporting to determine compliance with environmental laws. *See, e.g.*, Declaration of Dena Putnick ¶¶ 12-13, 17 (New York environmental agency relies on industry reporting of pretreatment of pollutants under EPA-enforced program to regulate discharges from publicly-owned treatment works under CWA in New York). EPA's failure to provide a reasoned explanation for this departure renders the Policy arbitrary and capricious. *See Encino Motorcars*, 136 S. Ct. at 2125; *FCC v. Fox*, 556 U.S. at 515.

Relatedly, as part of reasoned decision making, agencies must consider reasonable alternatives. *See*, *e.g.*, *New York v. HHS*, 414 F. Supp. 3d 475, 557 (S.D.N.Y. 2019) (HHS rule was arbitrary and capricious where "HHS failed to give sufficient consideration to the benefits of a more modest possibility" (citations and internal quotations omitted). Here, EPA could have issued guidance to any facilities that cannot practicably perform monitoring and reporting due to COVID-19 without effectively waiving requirements that protect public health. Indeed, EPA issued this narrower type of policy last month concerning enforcement at contaminated sites. *See* Omilian Decl., Exh. 17. Likewise, EPA could have written the Policy to deter violations by mandating notice and recordkeeping of noncompliance, sending the message that EPA would be making sure facilities did not take advantage of the Policy and preserving the information EPA would need to make any future potential enforcement decisions. It was arbitrary and capricious for EPA not to do so. *See New York v. HHS*, 414 F. Supp. 3d at 557.

By contrast, COVID-19 policies issued by our state environmental agencies (including those in plaintiff States of California, Illinois, Maryland, Michigan, Minnesota, Oregon, Vermont, and Virginia) take a case-by-case approach to compliance issues, balancing protecting public health with the safety of facility personnel. *See, e.g.*, Declaration of James Clift (Michigan) ¶¶ 3, 7 and Exh. A.[1] Several States also require facilities to request regulatory flexibility in advance of any anticipated noncompliance, and post those requests and agency responses on the state agencies' websites to inform the public. *Id.* ¶¶ 4, 6, and Exh. B.[2]

Because EPA failed to provide reasoned support for its blanket policy, including the essential facts on which this decision was based, the Policy is arbitrary and capricious. *See Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 103 (2d Cir. 2006).

### D.  The Policy violates APA notice and comment requirements.

Under the APA, federal agency rules may be issued only after notice-and-comment procedures, except for "interpretative rules [and] general statements of policy." 5 U.S.C. § 553(b)(3)(A). Whether an agency action constitutes such a legislative rule requiring notice-and-comment "turns on whether the agency action binds private parties or the agency itself with the force of law." *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 216 (D.C. Cir. 2007)

---

[1] *See also* California EPA (https://calepa.ca.gov/2020/04/15/calepa-statement-on-compliance-with-regulatory-requirements-during-the-covid-19-emergency/); Illinois EPA (https://www2.illinois.gov/epa/topics/Documents/Agency_Compliance_Expectations_Statement.pdf); Maryland MDE (https://mde.maryland.gov/Pages/MDE-COVID-19-Update.aspx); Minnesota PCA (https://www.pca.state.mn.us/covid-19/covid-19-and-regulatory-flexibility); Oregon DEQ (https://www.oregon.gov/deq/Pages/covid-19.aspx); Vermont DEQ (https://anr.vermont.gov/sites/anr/files/emergencyinfo/enforcement-discretion-covid-19-guidance.pdf); Virginia DEQ (https://www.ecos.org/wp-content/uploads/2020/03/Virginia-COVID-19compliance.pdf).

[2] *See also* Illinois EPA (https://www2.illinois.gov/epa/topics/Documents/COVID-19%20Enforcement%20Discretion%20Issues.pdf); Minnesota PCA (https://www.pca.state.mn.us/covid-19/requests-mpca-regulatory-flexibility-due-covid-19).

(citation omitted); *Gen. Elec. Co.*, 290 F.3d at 383 ("[I]f the language of the document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter."

The Policy's binding nature establishes it as an agency action subject to notice-and-comment rulemaking. It alters the obligations and rights of regulated entities and mandates that EPA staff restrain from engaging in any enforcement activities provided that certain conditions set forth in the Policy are met. *See* Point I.A.1, *supra*. The Policy does not indicate that EPA "may" apply its discretion, but rather states repeatedly that EPA "will apply" this Policy to future enforcement actions and potential violations, subject to the Policy's conditions. *See* Policy at 1; Omilian Decl., Exh. 3 ("EPA *will not seek* penalties for noncompliance" of monitoring and reporting requirements). The Policy's repeated and consistent use of "will" instead of "may" in describing EPA actions shows that EPA considers it a binding norm and is a legislative rule that should have gone through notice and comment rulemaking. *See Gen. Elec. Co.*, 290 F.3d at 383. Because EPA failed to provide notice and an opportunity for comment, the Policy violates the APA. 5 U.S.C. § 706(2)(D).

## II.  The Policy is Causing Irreparable Harm to the States.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Plaintiffs need only show a "*threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original). In addition, economic injuries may be irreparable where the party seeking relief will not be able to recover monetary damages to compensate for the impacts caused by an unlawful agency action.

*See* 5 U.S.C. § 702 (permitting relief "other than money damages"); *California v. Azar,* 911 F.3d 558, 581 (9th Cir. 2018) (finding that states would suffer irreparable economic harm if HHS rules limiting insurance coverage were not enjoined).

The Policy irreparably harms the States in several ways. It deprives States of information relevant to determining compliance and incentivizes pollution that threatens injury to the health and safety of our residents, particularly those in minority and low-income communities. States that seek to fill the enforcement void created by the Policy also will incur nonrecoverable costs.

**A. Increased pollution resulting from the Policy threatens our residents.**

By promising up front not to enforce against violations of monitoring and reporting obligations allegedly due to COVID-19 and lacking any required mechanism to verify facilities are acting in good faith, the Policy incentivizes noncompliance among the many facilities EPA regulates. *See* Shimshack Decl., ¶¶ 6-20, 30. Indeed, given that the API requested on behalf of its 600+ oil and gas industry members that EPA temporarily waive monitoring and reporting obligations, *see* Omilian Decl., Exh. 2 at 2, and facilities generally are facing increased financial pressure in light of current difficult economic conditions, it is "hardly-speculative . . . to predict that facilities would take advantage" of the relief EPA granted in order to save costs. *NRDC v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014)); *see also NRDC v. NHTSA*, 894 F.3d 95, 104-05 (2d Cir. 2018) ("the notion that financial incentives deter environmental misconduct is hardly novel") (citation and internal quotations omitted).

These violations of monitoring and reporting requirements will reduce the availability of information used by the States to determine compliance, hindering their ability to bring enforcement actions. For example, the Policy's effective waiver of the requirement to report on wastewater pretreatment will make it more difficult for the States determine industrial and commercial facilities' compliance with the Clean Water Act. Putnik Decl. ¶¶ 13, 17. And less

fenceline monitoring of toxic air pollutants from industrial facilities will deprive individuals living in adjacent communities of information regarding pollution threats. Shimshack Decl. ¶ 26.

Less monitoring and reporting also leads to more pollution. Requiring facilities to monitor and report their pollution levels deters them from violating regulatory and permit limits, *see* Point I.B.1, *infra*; *see also* Shimshack Decl., ¶¶ 15-18 (less enforcement and oversight result in more noncompliance). Moreover, facility noncompliance with environmental laws can occur rapidly in response to less regulatory oversight, resulting in increased pollution from those facilities. *Id.* ¶¶ 16-18 (discussing studies showing increased air and water pollution from regulated facilities followed shortly after reductions in enforcement and regulatory burdens).

The likely increases in pollution from facilities that take advantage of the Policy threatens the health of our residents. *See* Shimshack Decl. ¶¶ 23-26. Oil and gas facilities, for example, emit hazardous air pollutants as well as pollutants that contribute to fine particulate matter and ozone. *See*, *e.g.*, 84 Fed. Reg. 50,244, 50,250 (Sept. 24, 2019). EPA has found extensive public health harms from excess concentrations of these pollutants, including cardiovascular and respiratory harms and conditions like asthma and cancer. *See* Point I.C.1.b, *supra*; Dvarskas Decl. ¶ 8; Shimshack Decl. ¶¶ 24-26. Because industrial facilities are often located near low-income and minority communities, risks from increased pollution to these communities are heightened. *See* Point I.C.2, *supra*. This is happening at a time when low-income and minority communities are also suffering disproportionately from COVID-19, and when evidence is beginning to emerge linking air pollution to harms from the virus. *See id.*; Dvarskas Decl. ¶ 9. Although overall levels of fine particulate matter have decreased during the pandemic in some areas of the country, they have barely changed in others, such as the Chicago area. *See* Dvarskas

Decl. ¶ 10. Ozone levels that have remained flat in the New York City area during the pandemic (despite significantly less car traffic) are likely to rise now that the ozone season has begun. *Id.*

The Policy also increases the risk of harm from chemical facility accidents. Millions of people in our States live within the "vulnerability zones" of facilities subject to the Clean Air Act's chemical accident safety program, including over 9 million people in New York alone. *See* Washburn Decl., ¶¶ 5-6. By effectively waiving the requirements that facilities regularly test the integrity of piping and tanks storing hazardous chemicals, *see* 40 C.F.R. §§ 68.56(d), 68.73(d), the Policy makes it more likely that harmful accidents will occur. *See* 84 Fed. Reg. at 69,867 (EPA enforcement of chemical accident prevention requirements reduces "the likelihood of accidents and releases"); Omilian Decl., Exh. 18 (EPA enforcement alert discussing potential harm from chemical storage tank rupture); Washburn Decl. ¶¶ 10-14.

These "potential impact[s] on public health" are "itself sufficient irreparable harm to support preliminary injunctive relief." *New York v. BB's Corner, Inc.,* No. 12 Civ. 1828, 2012 WL 2402624, at *3 n.3 (S.D.N.Y. June 25, 2012); *see also New York v. Schweiker*, 557 F. Supp. 354, 359 (S.D.N.Y. 1983) (public health impacts of proposed regulation constituted irreparable harm to the state); *cf. Baur v. Veneman*, 352 F.3d 625, 635 (2d Cir. 2003) (with threatened environmental harm, "an unreasonable exposure to risk may itself cause cognizable injury.").

**B. The Policy irreparably harms the States by forcing them to expend nonrecoverable costs in attempting to determine facility compliance.**

By signaling that EPA will not enforce monitoring and reporting requirements, the Policy is forcing States to expend resources to fill the void in federal enforcement. This is of particular concern for those requirements under federal programs that EPA directly enforces in our States: including the Clean Water Act's industrial pretreatment program (in Illinois and New York) and the Clean Air Act's chemical accident prevention program (in all of the States except California).

New York's environmental agency anticipates increasing its monitoring and analysis of data regarding compliance with the Clean Water Act's industrial pretreatment program, at significant expense to the State. Putnik Decl. ¶ 19. Also, by effectively removing the threat of EPA enforcement of whether facilities regulated under the chemical accident prevention program are inspecting and testing equipment used to process and store hazardous chemicals, *see* 40 C.F.R. §§ 68.56(d), 68.73(d), the Policy is forcing New York to spend resources on investigating whether New York facilities are complying with those obligations. Washburn Decl. ¶¶ 10-13. These costs are nonrecoverable. Where, as here, the States will be obligated to "take steps to mitigate the risk[s]" attendant to the Policy, irreparable harm is established. *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d. 497, 537 (N.D. Cal. 2017); *see also Dist. of Columbia v. USDA*, No. CV 20-119 (BAH), 2020 WL 1236657, at *23 (D.D.C. Mar. 13, 2020) ("economic loss caused by federal agency action is an exception" to general rule that economic harm is not irreparable, "because the APA's waiver of sovereign immunity does not extend to damages claim").

## III.  The Public Interest and Balance of the Equities Favor the States.

The Policy is causing harm to the States, as described above, and "preventing the alleged economic and public health harms [would] provide[] a significant public benefit." *New York v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019). As such, the balance of the equities and public interest tip sharply in the States' favor. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Nken v. Holder*, 556 U.S. 418, 435 (2009) (the balance of the equities and the public interest "merge when the Government is the opposing party").

By contrast, EPA will suffer no harm: an injunction would simply restore the status quo of case-by-case enforcement under existing EPA policies. EPA did not explain why a case-by-case approach would be unworkable here. Nor did EPA did not cite any evidence that facilities

24

could not continue to perform monitoring and reporting. *See* Point I.C.2, *supra*. EPA itself and

state agencies have issued COVID-19 policies that provide guidance to facilities on compliance

obligations without effectively waiving requirements that protect public health. *See id.*

Because EPA "has acted in derogation of the APA and its own regulations, and there can

be no doubt that the public interest favors requiring the government to comply with the law."

*Velesaca v. Decker*, No. 20 Civ. 1803 (AKH), 2020 WL 2114984, at *13 (S.D.N.Y. May 4,

2020); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

## IV.  An Injunction Without Geographic Limitation is Appropriate.

The purpose of interim equitable relief "is not to conclusively determine the rights of the

parties . . . but to balance the equities as the litigation moves forward," bearing in mind "'the

overall public interest.'" *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017)

(quoting *Winter*, 555 U.S. at 26). The Supreme Court has held that that the "scope of injunctive

relief is dictated by the extent of the violation established, not by the geographical extent of the

plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Here, the States have demonstrated a likelihood of success on the merits of their claims

that EPA violated the APA, and nationwide relief is the usual course in an APA action because

"when a reviewing court determines that agency regulations are unlawful, the ordinary result is

that the rules are vacated—not that their application to the individual petitioners is proscribed."

*Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Here, because air and water

pollution does not observe geographic boundaries, the scope of injunctive relief should reflect

that reality. *See S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 968-70

(D.S.C. 2018) (enjoining without geographic limitation EPA rule suspending CWA rule).

## CONCLUSION

The States respectfully requests that the Policy be preliminarily enjoined.

DATED:  June 8, 2020                    Respectfully submitted,

                                        FOR THE STATE OF NEW YORK

                                        LETITIA JAMES
                                        Attorney General

                                        *S/ Michael J. Myers*[3]
                                        MICHAEL J. MYERS
                                        Senior Counsel
                                        MEREDITH G. LEE-CLARK
                                        BRIAN M. LUSIGNAN
                                        Assistant Attorneys General
                                        Environmental Protection Bureau
                                        The Capitol
                                        Albany, NY 12224
                                        (518) 776-2382
                                        michael.myers@ag.ny.gov

                                        SAMANTHA LISKOW
                                        Assistant Attorney General
                                        BENJAMIN COLE
                                        Project Attorney
                                        Environmental Protection Bureau
                                        28 Liberty Street
                                        New York, NY 10005
                                        (212) 416-8479
                                        samantha.liskow@ag.ny.gov

                                        PATRICK OMILIAN
                                        Assistant Attorney General
                                        Environmental Protection Bureau
                                        Main Place Tower
                                        350 Main Street, Suite 300A
                                        Buffalo, NY 14202
                                        (716) 853-8579
                                        patrick.omilian@ag.ny.gov

---

[3] Counsel for the State of New York represents that the other parties listed in the signature blocks on this document consent to this filing.

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
ATTORNEY GENERAL

*S/ David Zonana / MJM (by permission)*
DAVID ZONANA
Supervising Deputy Attorney General
1515 Clay Street, Suite 2000
Oakland, CA 94612
Ph: (510) 879-1248
david.zonana@doj.ca.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

*S/ Daniel I. Rottenberg /MJM (by permission)*
DANIEL I. ROTTENBERG**
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement and
Asbestos
Litigation Division
Office of the Attorney General
Environmental Bureau
69 W. Washington St., 18th Floor
Chicago, IL 60602
Ph: (312) 814-3816
drottenberg@atg.state.il.us

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

*S/ Steven J. Goldstein /MJM (by permission*)
STEVEN J. GOLDSTEIN*
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
Ph: (410) 576-6414
sgoldstein@oag.state.md.us

FOR THE PEOPLE OF THE
STATE OF MICHIGAN

DANA NESSEL
Attorney General

*S/ Elizabeth R. Husa Briggs /MJM (by permission)*
ELIZABETH R. HUSA BRIGGS
Assistant Attorney General
Michigan Department of the
Attorney General
525 W. Ottawa Street
P.O. Box 30758
Lansing, MI 48909
Ph: (517) 335-7603
Fax: (517) 335-1152
BriggsE1@michigan.gov

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General

*S/ Leigh Currie /MJM (by permission)*
LEIGH K. CURRIE**
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 900
Saint Paul, MN 55101
Ph: (651) 757-1291
leigh.currie@ag.state.mn.us


FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

*S/ Paul Garrahan /MJM (by permission)*
PAUL GARRAHAN**
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Ph: (503) 947-4593
Paul.Garrahan@doj.state.or.us

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

*S/ Jill S. Abrams /MJM (by permission)*
JILL S. ABRAMS
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
Ph: (802) 828-3171
jill.abrams@vermont.gov


FOR THE COMMONWEALTH OF
VIRGINIA

MARK HERRING
Attorney General

*S/ Jerald R. Hess /MJM (by permission)*
DONALD D. ANDERSON
Deputy Attorney General
PAUL KUGELMAN, JR.
Sr. Asst. Attorney General and Chief
JERALD R. HESS*
Assistant Attorney General
Environmental Section
202 North 9th Street
Richmond, VA 23219
(804) 371-8329
JHess@oag.state.va.us


*Pro Hac Vice applications to be filed*
**Pro Hac Vice applications pending*

28